**CHEMPLEX COMPANY, a Joint Venture,**
**Plaintiff,**

v.

**TAUBER OIL COMPANY, a Corporation,**
**Defendant.**

**Civ. No. 3–852–D.**

United States District Court,
S. D. Iowa,
Davenport Division.

Feb. 10, 1970.

Philip W. Tone, Donald Harris, Chicago, Ill., and George C. Eddy, Jr., Clinton, Iowa, for plaintiff.

Richard W. Farwell, Clinton, Iowa, for defendant.

## MEMORANDUM AND ORDER

### STEPHENSON, Chief Judge.

This is a declaratory judgment action in which an adjudication of rights arising as a result of a contract between the parties is sought. The cause was tried to the Court sitting without a jury. Final briefs were submitted December 16, 1969, and this matter is now before the Court for final determination. Jurisdiction is based on diversity.

### FINDINGS OF FACT

The facts giving rise to this litigation and pertinent to its determination are found by the Court to be as follows:

During the year 1967, Chemplex, an unincorporated joint venture,[1] had under construction a new petrochemical manufacturing plant at Clinton, Iowa. Construction was expected to be completed early in 1968. The new Chemplex plant, when completed, was expected to produce several by-products in conjunction with the production of its primary product, ethylene. Of these by-products, propylene was expected to be produced in considerable quantities.[2] As a result, Chemplex let it be known through the trade that it would have this product, propylene, for sale when the plant was completed.

Among firms receiving information concerning the anticipated propylene production was the Tauber Oil Company, defendant herein. After some negotiation between the parties, a contract relating to the purchase and sale of the propylene was concluded between Chemplex and the Tauber Oil Company. At the time of the execution of the contract, Tauber Oil was a proprietorship with its principal offices at Houston, Texas. Since that time, Tauber Oil has been incorporated under the laws of Texas and the contract, with the approval of Chemplex, has been assigned to the corporation.

The terms of the contract negotiated between the parties are basic to the issues in this dispute. Therefore, all the pertinent parts thereof will be presented in detail.

Under the terms of the contract, Chemplex is obligated to sell, subject to certain limitations not here in issue, the total production of propylene at its Clinton, Iowa, plant to Tauber Oil. Tauber, also subject to certain limitations not in issue here, is obligated to receive, purchase and pay for all the propylene manufactured by Chemplex at Clinton, Iowa. Price is $.02 per pound, F.O.B. Tauber's tank cars at the plant.

At this juncture, it should be noted that Tauber Oil Company does not use or consume the products it purchases. Rather, it is what is known in the trade as a marketer. That is, it resells the goods to others who do use or consume them. Tauber resold the propylene in question here to the Monsanto Company via what is known in the trade as a "mirror" or "back to back" contract. The Monsanto-Tauber contract, then, substantially repeats the terms of the Tauber-Chemplex contract, except for a difference in price which allows for Tauber's margin of profit.[3]

---

1. The members of the venture are the Shelly Oil Company, a Delaware Corporation, registered to do business in Iowa under the name of Chemplex Company, and the American Can Company, a New Jersey Corporation also registered to do business in Iowa under the name of Chemplex Company.

2. Some producers of ethylene consider propylene a co-product.

3. As a matter of fact, Monsanto was instrumental in devising part of the terms and conditions existing in the contract between Tauber and Chemplex.

The term of the agreement between the parties here, the Tauber-Chemplex contract, extends for a period of two years, beginning at 8:00 a. m. on April 1, 1968, and concluding at 8:00 a. m. on April 1, 1970. The contract also contains extension options under which Tauber, with certain restrictions, may extend the terms of the agreement for three successive periods of one year each from April 1, 1970, to April 1, 1973. The restrictions placed on these options create the nub of this lawsuit.

It should be noted like restrictions on option to renew also appear in the resale contract between Tauber Oil and the Monsanto Company. However, as will be seen, these restrictions proved inadequate to protect Tauber Oil under the facts as Chemplex alleges they developed.

The Tauber-Chemplex contract, in referring to the extension options, recites in part as follows:

"Not later than January 1, 1969, January 1, 1970, and January 1, 1971, Chemplex shall notify Tauber, in writing, as to the amount, if any, of Propylene which shall be available for sale at the Plant * * * during the twelve (12) months' period beginning April 1, 1970, April 1, 1971, and April 1, 1972, respectively, and not later than June 30 next following receipt of that particular notice, Tauber shall notify Chemplex, in writing, as to whether it desires to, and does, exercise its option to extend the term of this Agreement for the year involved. If Tauber shall not elect to extend the term of this Agreement for any year as to which it shall have the right to do so, this Agreement shall become terminated at the end of the then Contract Year. "If at the time Chemplex shall notify Tauber as to the quantity of Propylene which shall be available for sale at the Plant pursuant to the provisions of Article VI it shall have then received a more favorable bona fide offer to purchase said Propylene on the same or comparable terms and condi-

tions, Chemplex shall give Tauber full particulars thereof. In that event, Tauber shall have the right to purchase said Propylene during that yearly extension period but only on the same conditions of the more favorable bona fide offer so received from such other proposed purchaser. Otherwise, all of the terms and provisions of this Agreement shall be applicable within said extended period."

The last paragraph of the foregoing quotation referring to "a more favorable bona fide offer" is known in the trade and has been referred to by the parties here as a "most favored nations" clause. It will be so referred to by the Court.

In keeping with the foregoing terms and conditions of the contract, Chemplex, by letter dated December 20, 1968, notified Tauber that quantities of propylene in the amount of eighty million pounds was estimated as that as would be available for sale during the twelve month period beginning on April 1, 1970. By the same correspondence, Chemplex notified Tauber that it had received a more favorable bona fide offer for the subject propylene.

The receipt of a more favorable bona fide offer by Chemplex would not, of course, have any effect on the resale contract between Tauber and Monsanto. That contract would remain renewable at Monsanto's option on its original terms unless Tauber received a more favorable bona fide offer for the resale of the subject propylene. Such an offer to Tauber was not forthcoming.

Numerous phone and personal conversations were had by the parties discussing the situation created by Chemplex's receipt of the alleged more favorable bona fide offer. An agreement concerning the problem was not reached and on March 28, 1969, Chemplex notified Tauber that it considered a reasonable time had elapsed for deliberation regarding the offer and that after April 8, 1969, it would consider its propylene production subsequent to April 1, 1970, available for sale free of any further options on the part of the Tauber Oil Company.

Tauber's reply to the Chemplex notice was transmitted three days later on March 31, 1969. It, in effect, notified Chemplex that the contract options were being exercised to extend the contract to April 1, 1971. Chemplex was further notified that Tauber did not recognize the subject offer made to Chemplex as being "a more favorable bona fide offer to purchase [the] said propylene on the same or comparable terms and conditions."

Obviously, the Court must resolve the question of whether or not Chemplex received an offer to purchase the subject propylene which was actually a more favorable bona fide offer on comparable terms and conditions than the terms and conditions of the existing Tauber-Chemplex contract, if a final determination is to be reached in this lawsuit. It is necessary, then, to attempt a comparison of the terms and conditions of the alleged new offer with those of the existing Tauber-Chemplex contract.

The terms and conditions of the new offer, deleting those substantially identical to those of the existing contract, are as follows:

"4. *Price*: Buyer will pay Seller $.140 per stream gallon ($.323 per pound [at] 4.33 pounds per gallon) of product, F.O.B. Clinton, Iowa; except that should Buyer receive a bona fide offer to purchase like material at a price below $.140 per stream gallon, Seller must either meet that price or release Buyer from its purchase obligations for that quantity.

"5. *Term*: The agreement shall be for a period of one year, beginning April 1, 1970, and shall continue from year-to-year thereafter unless cancelled by either party notifying the other no later than 60 days prior to any anniversary of the agreement."

Quantity was to be either the total production of Seller, estimated to be approximately 60 to 80 million pounds per year, or fifty per cent (50%) of that total, at Seller's option; said option to be exercised no later than August 1, 1969.

Under the terms of the existing Tauber-Chemplex contract, price for propylene produced from April 1, 1970, to April 1, 1971, is to be $.02 per pound, F.O.B. Tauber's cars at the plant, subject to change only if a more favorable bona fide offer be received by Chemplex and transmitted to Tauber prior to January 1, 1969. Such has not been the case, excluding the alleged offer which is the subject of this controversy. The price, then, under the existing contract for the production of propylene from April 1, 1970, to April 1, 1971, is $.02, firm. Tauber has the right to purchase all the production of Propylene at the plant, excluding any portion or all of said production which Chemplex should desire to use for its own production purposes at the plant or elsewhere.

In addition to the foregoing differences, product specifications contain variances. Depending upon the use to be made of the product, these variances may or may not be a substantial consideration to the consumer. It appears the differences are only of a minor consideration to the producer. At any rate, the variances present here must be given the appropriate consideration due them when attempts to compare the offer with the existing contract are made.

### CONCLUSIONS

■■ It has been said that the "comparability provisions of the favored-nations clauses govern determination of whether a dollar and cents price, greater on its face, is actually higher when pertinent factors of the two transactions are compared." Pure Oil Company v. Federal Power Commission, 299 F.2d 370 (7th Cir. 1962). The major purpose of the clause itself, then, is to protect the seller from potential losses due to increases in the market price of his product during the term of a relatively long range contract. See Pure Oil Company v. Federal Power Commission, *supra*; Shell Oil Company v. Federal

Power Commission, 334 F.2d 1002 (3rd Cir. 1964).

Tauber argues forceably that the existing contract and the alleged offer here are not comparable in their respective terms and conditions. The argument is based on the premise that one calls for buyer's price protection while the other contains price protection for the seller; one pertains to all of the production of seller with certain restrictions relating to seller's own use of the product while the other allows seller the option of restricting the contract to fifty per cent (50%) of his production. It can also be noted that the new offer, if accepted, would result in an "evergreen"[4] contract, whereas the existing contract contains option provisions in favor of buyer subject to the most favored nations clause in favor of seller.[5]

There is scant evidence in the record to indicate the meaning of the phrase "same or comparable terms and conditions" as it was used in the contract here under discussion. Webster indicates that comparable means "capable of being compared with; worthy of comparison (to)." Comparison is said to mean "an act of representing as like; a likening" or "an examination of two or more objects with the view of discovering resemblances and differences." See generally Webster's New International Dictionary, Second Edition, at p. 543.

■ In referring to "comparable" as used in reference to the sale or taxation of real property, it has been generally held that the properties need not be identical, but they must be similar. See Fairfield Gardens Inc. v. United States, 306 F.2d 167, 173 (9th Cir. 1962); Mason v. Woods, 172 F.2d 857, 860 (Emer.Ct.App.1949); McKnight Shopping Center, Inc. v. Board of Property Assessment and Review of Allegheny County, 417 Pa. 234, 209 A.2d 389, 393 (1965). And, under a statute providing that every contract made by a contract carrier for transportation service shall be comparable to the rate charged by any common carrier, two rates were held to be comparable if they are substantially equal. Coyle v. Department of Motor Transportation, 298 S.W.2d 303, 305 (Ky. 1956).

■ "Comparable" as used by the parties here follows and is closely connected with the use of the term "same." Its use seeks to describe an allowable alternative, something which is a satisfactory substitute for the original. Comparable terms and conditions need not be the same as the originals, but they must be similar to them.

■ The Court finds the favored nations clause here in question to be a seller's price protection clause and that other terms and conditions of a proposed more favorable bona fide offer must be substantially similar to those of the existing contract for the offer to affect the rights of the parties thereunder.

The Court further finds the variances existing between the terms and conditions of the offer received by Chemplex about December 9, 1968, and under discussion here and those of the existing contract between Chemplex and the Tauber Oil Company are of such magnitude as to render the two dissimilar and not comparable. The buyer protection clause available to the buyer in the alleged more favorable offer is not available to the buyer, Tauber, under the existing contract. This alone is of sufficient magnitude to render the two not comparable. Under such circumstances, the relative positions of the parties to this lawsuit, and their respective rights and duties, remain the same as if no

---

4. The term evergreen has been used in connection with this case to describe a contract which renews itself from year-to-year in lieu of notice by one of the parties to the contrary.

5. It has been previously noted that differences in product specifications also exist.

such offer had ever been received by plaintiff.

In view of the foregoing, it is unnecessary for the Court to reach the other issues present in the case.