**LOUISIANA–NEVADA TRANSIT CO., Plaintiff,**

v.

**Dalton J. WOODS et al., Defendants.**

**No. T–73–C–43.**

United States District Court, W. D. Arkansas, Texarkana Division.

May 5, 1975.

ferred to as "LNT"; Texas Gas Transmission Corporation as "TGT" and United Gas Pipe Line Company as "United").

The jurisdiction of the Court is not in question.

The actual controversy involves the rights of various parties under gas purchase contracts of natural gas produced in the Walker Creek field in Lafayette-Columbia Counties of Arkansas and specifically the following wells:

### WELLS

| | | |
|---|---|---|
| Bodcaw—Unit 2 | Woods—Stuart 2 | Woods—Jack 1 |
| bodcaw—Unit 3 | woods—Stuart 3 | Woods—Stuart 4 |
| Woods—Blackwell | Woods—Powell | Woods—Teutsch |
| Woods—Stuart 1 | Woods—knight | Bodcaw—E. Kosek |
| | | Bodcaw—Jack 2. |

Each contract involved in this case contains what is known as a "Favored Nations Clause," which under certain conditions requires that the price to be paid for the natural gas shall be increased to a price equivalent to any higher price for gas sold from the Walker Creek field *"under comparable conditions."* (Emphasis added.)

The Favored Nations Clause which is set forth in each contract is as follows:

---

Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Tulsa, Okl., McKay, Chandler & Choate, Keith, Clegg & Eckert, Magnolia, Ark., for defendants-intervenors.

Holland & Hart, Denver, Colo., House, Holmes & Jewell, Little Rock, Ark., for plaintiff Louisiana-Nevada Transit Co.

## MEMORANDUM OPINION

PAUL X WILLIAMS, Chief Judge.

On June 27, 1973 the plaintiff, Louisiana-Nevada Transit Company, filed complaint herein seeking a declaratory judgment.

(Hereafter in this opinion Louisiana-Nevada Transit Company will be re-

"9.3 Notwithstanding paragraph 9.1 hereof, in the event Buyer or any other gas purchaser shall pay for any gas delivered from the Walker Creek Field under conditions comparable to those provided herein, a price higher than that provided in paragraph 9.1, then the price of all gas delivered hereunder shall be increased as of the first day of the month following the commencement of such deliveries or the proposed effective date of said written offer to an equivalent price. Buyer shall have the right to require under the provisions of this paragraph, reasonable proof of the delivery of gas to any other gas purchaser and the price thereof. In determining equivalent price under comparable conditions, the price which Seller asserts to

be higher shall be adjusted for all factors reasonably relevant to a determination of equivalent price which may be different from those provided herein, such as pressure base, delivery point, quality, delivery pressure and gathering, transportation or compression charges. The provisions of this paragraph 9.3 shall be applicable as often as any of the events in this paragraph specified shall occur. In the event Buyer notifies Seller in writing that it will not meet any price resulting under this paragraph, Seller may terminate this Agreement as to all gas dedicated hereto upon thirty (30) days written notice to Buyer."

The Walker Creek Field was discovered by H. A. Chapman in the spring of 1968. It is located in Lafayette and Columbia Counties, Arkansas and lies in close proximity to the Arkansas-Louisiana line. It is classified by the Arkansas Oil and Gas Commission as an oil field, but in connection with the production of oil there is also produced substantial quantities of gas. This gas is rich in liquefiable hydrocarbons which can be removed by the use of gas processing plants.

Following initial discovery of the field, development proceeded with drilling on the basis of 320-acre spacing units (that is, one well being located on each 320 acres) and at the present time the field is comprised of 46 320-acre units. The field produces approximately ten to fifteen percent of the total daily oil production of the state of Arkansas. Originally, the plaintiff "LNT" was the only purchaser of gas from this field and the first contract of sale was made between Chapman and plaintiff "LNT" under date of March 29, 1968.

Subsequently, Dalton J. Woods (and other defendants associated with him in various wells and in varying degrees of interest) drilled producing wells in a geographical expansion of the field. The first Woods producer, Blackwell No. 2 well, was completed in late 1969 and the contract for the sale of gas to plaintiff "LNT" was made in 1970.

The original contracts between Chapman and Woods et al and "LNT" for the sale and purchase of gas provided that the delivery point to "LNT" would be at the well covered by the contract. Plaintiff "LNT" was, therefore, obligated by those original contracts to gather the gas from the wells and transport it to plaintiff's main transmission lines at plaintiff, "LNT'S" cost and there being no other gas purchaser in the field, the original contract contained no Favored Nations Clause. The original price was $0.1875 per MCF.

All of the gas produced in the field is sold to one of three purchasers, "LNT", "TGT" or "United", and at no time has gas been sold to any other purchaser. Almost all of the gas in the field is processed for the removal of liquefiable hydrocarbons (LPG) at one of two processing plants. One is the Chapman Plant operated by H. A. Chapman, and is owned by certain (but not all) of the producers in the field. The Chapman Plant is physically located in the field and is adjacent to "LNT's" main transmission line. The other processing plant (the Beacon Plant) is owned by Beacon and is located at Minden, Louisiana, just across the state line some 20 to 30 miles south of the field.

Both plants own and operate their own gathering systems in the field. Gas is picked up at the wellhead, transported to the applicable processing plant and delivered at the tailgate of the plant (after processing) to the pipeline purchaser. The point of sale and delivery in each instance is at the tailgate of the respective plant. The Chapman Plant makes no charge to the producer for gathering and transporting a producer's gas from its wells to "LNT". Beacon charges its producers a gathering charge

of one-quarter (¼) cent per MCF for all gas picked up, gathered and delivered to the pipeline.

All gas which is processed in the Chapman Plant is sold to "LNT" and all gas which is processed in the Beacon Plant is sold to either "TGT" or "United". The sales to "LNT" are intrastate sales whereas the sales to "TGT" and "United" are interstate sales and subject to Federal Power Commission jurisdiction.

At the time "LNT" first began purchasing gas in the field the Chapman Plant had not yet been constructed. The original "LNT" gas purchase contracts required "LNT" to build its own gathering lines to each individual well from which it purchased gas. This "LNT" did and until the Chapman Plant became operational in May, 1971, all gas sold in the field to "LNT" was picked up by "LNT" at or near the wells in its own gathering system.

Soon after the field was discovered, the producers recognized the advantage of extracting the liquefiable hydrocarbons contained in the gas produced. In mid-1970 a decision was made by certain of the producers in the field, including Chapman and Woods, to build the Chapman plant for the processing of gas. One of the problems was that of gathering the gas and transporting it from the wells to the Chapman Plant.

Past experience with the "LNT" system was unsatisfactory to producers. All producers selling the "LNT" had suffered at times the flaring of gas due to the inadequacy of the "LNT" system and Mr. Woods, being on the furthest end of the "LNT" system, had suffered the largest amount of flaring. The Chapman Plant had no interest in purchasing or using the existing "LNT" system and installed and now operates its own gathering system. The evidence shows no further problems of flaring of gas once the Chapman plant gathering system became operational.

The Chapman Plant became operational approximately the 1st of May, 1971.

Meanwhile, in late 1969, a second purchaser, "TGT" made a contract with Bodcaw Company (another producer) for the purchase of Bodcaw's gas in the Walker Creek Field, at the tailgate of the Beacon Plant.

In the early fall of 1970, Woods brought in his Stuart No. 2 well; and discussion ensued between Woods and "LNT" concerning the purchase of that gas. Woods indicated a willingness to sell the gas to "LNT" but since there was now another purchaser in the field, Woods required that the Stuart No. 2 gas contract contain a Favored Nations Clause. The evidence shows that "LNT" acceded to this demand and a contract containing a Favored Nations Clause was prepared by "LNT" and forwarded to Woods. This contract, dated October 1, 1970, was executed by Woods.

On July 28, 1971, "TGT" raised the price it was paying to Bodcaw Company to 26¢ per MCF. About the same time Woods completed his Stuart No. 3, Teutsch No. 1 and the Knight No. 1 wells. On September 14, 1971, Woods wrote plaintiff demanding that the price for Wood's gas under the Stuart No. 2 well be increased to 26¢ effective July 28, 1971 pursuant to the Favored Nations Clause in the Stuart No. 2 contract. On September 21 1971, Mr. Jim Emory of "LNT" wrote Mr. Woods recognizing "LNT'S" obligation to meet competitive prices and asking for proof of the increase in price of gas being paid by "TGT" to Bodcaw. On October 28, 1971, Bodcaw confirmed by letter the price increase by "TGT". On October 13, 1971, G. C. Mayhue, attorney for "LNT", telephoned Woods advising him that "LNT" would meet the Bodcaw price of 26¢ pursuant to the Favored Nations Clause of the Stuart No. 2 contract and would pay 26¢ for his undedicated gas from the Knight and Teutsch wells.

Thereafter, on December 2, 1971, a meeting was held in Tulsa, at which were present Mr. Dalton Woods and representatives of Chapman and "LNT". At that meeting Mr. Mayhue, on behalf of "LNT" made a new proposal, as follows: (1) "LNT" would meet the current price of 26¢ being paid by "TGT" for all gas not then dedicated under contract; (2) new contracts would be prepared for all gas (both previously dedicated and undedicated gas) so that all gas being sold to "LNT" would be sold under uniform contracts; and (3) all contracts would contain Favored Nations Clauses, but the Favored Nations Clauses in the contract for gas already dedicated would not become effective until January 1, 1974.

"LNT" again stated that it was unwilling to buy the Chapman Plant gathering system, but that it was willing to pay a gathering charge of 9¢ per MCF to help the plant owners recoup a portion of their investment in the gathering system.

"LNT'S" proposal were accepted and all owners of undedicated gas in the field were notified accordingly and pursuant to the letter agreement of March 17, 1972, uniform gas purchase agreements were made for the Stuart No. 3 and 4, Teutsch No. 1, Knight No. 1, and Jack Nos. 1 and 2. The Stuart No. 2 contract was left unchanged; but for the purpose of this litigation it is agreed it is identical in all material respects. Each of these contracts provided in Paragraph 6.1 that the delivery of gas to the tailgate of the Chapman plant would be the responsibility of the seller. However, Paragraph 6.2 provided:

"6.2 Notwithstanding paragraph 6.1 hereof, the parties anticipate that Seller will enter into a Gas Processing Agreement with the owners of the Walker Creek Gasoline Plant for the processing of Seller's gas therein prior to delivery to Buyer, which Agreement will require said owners to construct, maintain and operate the equipment and facilities for which Seller is responsible under paragraph 6.1. In the event said Plant owners have not constructed the equipment and facilities necessary to enable Seller to make delivery of its gas from its wells to the point of delivery hereunder by July 1, 1972, or if such plant equipment and facilities be constructed but later abandoned by such plant owners for any reason, then either party may terminate this Agreement upon thirty (30) days written notice to the other unless before such time Buyer shall agree to construct, maintain and operate the same. In the event Seller is now or shall hereafter become a plant owner, nothing herein shall require Seller to operate the said plant, equipment or facilities in the event such operations become unprofitable."

Consistent with Paragraph 6.2 quoted above, the sellers and the processors entered into contracts of the same date providing:

"2.1 Not later than March 1, 1972, Processor shall commence construction of a gathering system for the gathering and transportation of gas produced from each of Producer's wells dedicated hereto . . . . and for the transportation of such gas to the plant. Producer shall at Producer's sole cost, risk and expense be responsible for the diligent and workmanlike construction, operation and maintenance of all equipment necessary to enable Producer to effect deliveries of gas in accordance with this Agreement to Processor at the lease gas delivery point. Processor, at its sole cost, risk and expense, shall be responsible for the diligent and workmanlike construction, operation and maintenance of all equipment and pipelines

necessary to receive deliveries of gas under this Agreement at the lease gas delivery point, to transport the same to the plant, and to deliver the residue gas to the Gas Purchaser at the residue gas delivery point."

---

Effective March 26, 1972, United Gas Pipe Line Company increased the price it paid to Pennzoil Producing Company for gas in the Walker Creek Field to 35¢ per MCF.

By letter of September 11, 1972, Woods made demand upon Plaintiff for an increase in price under the Favored Nations Clause to 35¢.

Effective March 8, 1973, "TGT" raised the price it paid to Austral for gas in the Walker Creek field to 35¢ per MCF.

Effective March 27, 1973, "United" increased the price paid by it to Pennzoil to 45¢ per MCF.

In addition to the sale to "TGT" and the two sales to "United", two additional sales of gas from the Walker Creek Field have recently occurred. Defendant-Intervenors introduced at trial (Defendant's Exhibit No. 27) a copy of filing certified by the Secretary of the Federal Power Commission in Pennzoil Producing Company, Docket CI 75–355 which included the filing by Pennzoil and the FPC's Findings and Order issued February 18, 1975. These proceedings show that Pennzoil commenced, on November 14, 1974, a 60-day emergency sale of natural gas from the Walker Creek Field to be delivered at the Tailgate of the Beacon Plant to United at a price of 61.8¢ per MCF and that Pennzoil had entered into a gas purchase contract with United covering said *60 day* period plus the additional period of twelve months. The FPC's order approved the twelve-month limited term portion of the contract at the national rate of 51¢ per MCF at 14.73 psi pressure base, plus 1¢ per MCF gathering allowance adjustment, plus Arkansas severance tax reimbursement of $0.035 per MCF (14.65 psi pressure base).

Mr. Henry Coutret testified at trial that these prices converted to a 14.65 psi pressure base would be equivalent to 52.-07¢ per MCF and the verified application on file in this proceeding indicates that at the time of the execution of the foregoing gas purchase agreement, there was no longer any affiliation between Pennzoil and United.

The Defendant-Intervenors also introduced at trial a copy (certified by the Secretary of the Federal Power Commission) of a filing made by Marathon Oil Company in Docket No. CI 75–450 (Defendant's Exhibit No. 28) which stated that Marathon Oil Company had entered into a gas purchase contract dated January 24, 1975 with "TGT" for the sale of gas by Marathon from the Walker Creek Field to be delivered at the tailgate of the Beacon Plant for a contract price of 60¢ per MCF (15.025 psi pressure base). The application under oath stated that Marathon commenced a sixty day emergency sale to "TGT" on February 1, 1975, and requested approval of its sale to "TGT" on for a period of one year following said sixty day emergency sale, or until such sooner time as recycling operation begin in the Walker Creek Field. There is no affiliation between Marathon and "TGT".

The one year limited term sale which was approved by the FPC in Pennzoil's Docket No. CI 75–255 was made and approved under FPC Order No. 431 (18 CFR Section 2.70) and contains pre-granted abandonment privileges. The one year limited term certificate sale filed in Marathon's Docket No. CI 75–450 is also to be made under FPC Order No. 431 and requests pre-granted abandonment privileges.

Defendants-Intervenors duly made demand upon Plaintiff to increase its price to them in accordance with the various Favored Nations Clauses in the contracts referred to in the Complaint and Intervention, but Plaintiff "LNT" has consistently refused contending that:

The Favored Nations Clause Has Not Been Triggered In The "LNT" Contracts Because the Conditions pro-

vided Therein Are not Comparable To the Pennzoil-United Contracts or the Austral-Texas Gas Contracts for the following reasons:

A. The LNT contracts are long-term contracts, where as the alleged triggering contracts are emergency short-term contracts and are not quantifiable in that regard ......................

B. The "Take or Pay" provisions of the LNT contracts differ materially from the alleged triggering contracts and are not quantifiable in that regard ...............

C. The LNT contracts involve only intra-state sales of gas, whereas the alleged triggering contracts involve interstate gas sales subject to the jurisdiction of the Federal Power Commission and are not quantifiable in that regard ......................

D. The Pressure Base specified in the LNT contracts differs materially from the alleged triggering contracts ...................

E. The Delivery Pressure specified in the LNT contracts differs materially from the alleged triggering contracts ................

F. The LNT contracts differ materially from the Pennzoil—United contracts in that the latter is subject to a transportation charge of ¼ cents ....................

G. In the LNT contracts, the purchaser bears the cost of paying the royalties due under the contract, whereas the purchasers in the alleged triggering contracts do not handle such payments ....

H. There is no corporate affiliation between the purchasers and the sellers in the LNT contracts, whereas there is such a relationship in the Pennzoil-United contracts ......................

And that notwithstanding the Contracts Are Not Comparable, LNT Has Been Making Payments In Amounts At Least Equivalent to 35 cents Per m. c. f. For The Period Of Time Relevant Thereto ....................

Defendant-Intervenors admit that differences exist in the contracts but (with the exception of differences in pressure base which can be adjusted for) contend there is no evidence that any of these differences are material. Plaintiff cites the case of Chemplex Company v. Tauber Oil Company, 309 F.Supp. 904 (S.D. Ia.1970), in which the Court found that the contracts were not comparable and that the Favored Nations Clause had not been triggered. The Court in considering the meaning of the word "comparable" as used in the Chemplex-Tauber contract, said that comparable terms and conditions need not be the same as the original but they must be similar to them. The Court then found that the variances between the two contracts were of such magnitude as to render the two dissimilar and, therefore, not comparable.

The Favored Nations Clause in the *Chemplex* case referred to the receipt of a more favorable bona fide offer of purchase and specified that in the event the Favored Nations Clause became operative by the triggering contract, it would do so "only on the same conditions of the more favorable bona fide offer." Thus Tauber would have been bound to accept an entire contract which it had not had a part in negotiating. In such a situation it is only fair that "comparable" be narrowly construed to avoid a party having thrust upon it terms it has not contemplated. The court in *Chemplex* found that the price de-escalation provisions in the bona fide offer made the contract as a whole materially different from the Chemplex-Tauber contract and thus not comparable, which is a desirable result under those circumstances.

Here the triggering of the Favored Nations Clause is keyed not to receipt of a more favorable bona fide offer made to sell but to the actual payment of a higher price for gas from the field. If

the "LNT" Favored Nations Clause is triggered, only the price changes. The other terms and provisions of the "LNT" contracts and the rights and obligations of "LNT" remained unchanged. Further, in the "LNT" contracts we are not required to look to each and every term of the proposed triggering contract to see if that contract is overall "more favorable" than the "LNT" contract but the sole question is: Is the price being paid under another contract higher?

The "LNT" Favored Nations Clause expressly recognized that differences may exist in pressure base, delivery point, quality, delivery pressure, and gathering, transportation and compression charges as well as other factors.

 "Comparable" means "capable of being compared with" and it is in this sense the word "comparable" is used in the "LNT" contracts. See also the case of Sirianni v. Bowles, 148 F.2d 343 (Em.App., 1945), where the Court said:

"Two accommodations are 'comparable' if they are sufficiently similar to be regarded by an expert as of substantially equal rental value. *Two accommodations may also be 'comparable', for present purposes, if they are sufficiently similar so that an expert, taking as a standard the rent prevailing for one, and making allowances for such differences as would be reflected in rental value, would be able to determine the appropriate corresponding rent for the other."* (Emphasis added.)

The Court finds that in the case at bar the contracts are capable of comparision and therefore comparable.

The Favored Nations Clause obviously is not a buyer's clause since it can only have the effect of increasing the buyer's cost of gas. The court in the Chemplex case, after reviewing cases involving the use of Favored Nations Clauses in gas sales contracts, said:

"The major purpose of the clause itself, then, is to protect the seller from potential losses due to increases in the market price of his product during the term of a relatively long range contract." Chemplex Company v. Tauber Oil Company, supra, at 907.

In the Walker Creek field Gas prices have increased from 18.75 cents per MCF in 1968 to 26 cents per MCF in 1970, to 35 cents per MCF in 1972, to 45 cents per MCF in 1973, and to 60¢ per MCF by the end of 1974. Obviously, a seller has no interest in committing his gas to long term contracts at a fixed price in the face of such rapidly increasing prices. The Favored Nations Clause is a tool to enable a buyer to induce a seller to commit gas reserves to the buyer for a long period of time. It is the buyer's assurance to the seller that the seller will always be receiving a price for his gas equal to the current price.

 In construing a contract in order to give effect to the intention of the parties, the Court must consider the circumstances surrounding the making of the contract, its subject, and the situation and relation of the parties at the time of its making; and the construction placed upon the contract by the parties to it as reflected by their words and acts is entitled to great, if not controlling influence in ascertaining the parties' understanding of its terms. Hurst v. Flippin School District No. 26, 228 Ark. 1151, 312 S.W.2d 915 (1958); Craig v. Thompson, 177 F.2d 457 (8th Cir. 1949); American Republic Life Insurance Company v. Flynn, 218 Ark. 825, 238 S.W.2d 937 (1951); Continental Insurance Company v. Harris, 190 Ark. 1110, 82 S.W.2d 841 (1935); Beasley v. Boren, 210 Ark. 608, 197 S.W.2d 287 (1946).

At the time the Favored Nations Clause first appeared in an "LNT" contract (the Stuart No. 2 Contract dated October 1, 1970), "TGT" was already purchasing gas in the field from Bodcaw Company. This gas was being gathered in the field by Beacon, processed in the Beacon Plant and delivered to "TGT" at

the same point of delivery involved in the "United" and "TGT" contracts here in question. In fact, at that time, there were only two sources of sales for Walker Creek Field gas: One was an intrastate sale to "LNT", the other was an interstate FPC regulated sale to "TGT". At the time the Favored Nations Clauses were added to the other contracts in March of 1972 there was still only one intrastate buyer in the field, that being "LNT". All other markets were interstate being "TGT" and "United." Also at the time of the inclusion of the Favored Nations Clauses in the 1972 "LNT" contracts there were only two gathering systems in the field, one operated by the Chapman Plant and the other operated by the Beacon Plant. Because of the wetness of the gas produced in the field, almost all gas was being processed in one plant or the other. All gas processed in the Chapman Plant was delivered to "LNT". Therefore any gas not sold to "LNT" would logically be sold in an interstate sale, since it would probably be processed in the Beacon Plant located across the state line in the State of Louisiana and because the only other purchasers were interstate purchasers. It is unlikely under those circumstances that any additional intrastate purchaser would enter the field and build its own gasoline plant for processing the gas.

Here the Favored Nations Clause requires only that the triggering contract be one for the sale of gas from the Walker Creek Field.

Further, "LNT", by honoring the demand of Woods for a price increase on his Stuart No. 2 well, has already provided the proper construction of the Favored Nations Clause. The evidence in the trial shows that effective July 28, 1971, "TGT" raised the price it was paying to Bodcaw Company to 26¢ per MCF for Bodcaw's gas from this field. On September 14, 1971, Woods wrote Plaintiff demanding that the price for his gas be increased to 26¢ effective July 28, 1971, pursuant to the Favored Na-

tions Clause in his Stuart No. 2 contract. On September 21, 1971, Mr. Emory, knowing the interstate nature of the Bodcaw sale, asked Woods for proof of the price increase. On October 13, 1971, Plaintiff's attorney, G. C. Mayhue, advised Woods by telephone that Plaintiff would meet the Bodcaw price of 26¢ as to the Stuart No. 2 well. It honored the Favored Nations Clause based upon the sale to "TGT", which was a sale in interstate commerce. Thus, "LNT" acknowledged that an interstate FRC regulated contract may be a triggering contract under the Favored Nations Clause because it raised its price to 26¢.

This Court finds that "LNT" properly recognized its duty to raise the price at that time and finds that the Favored Nations Clause has been triggered by the later sales which are a part of the proof herein.

In reaching this conclusion and making this declaration the Court disposes of contentions of "LNT" lettered A through H.

■ "LNT", in addition, contends that the contracts are not comparable because "LNT" has been paying the gathering fee of 9¢ making the equivalent of a 35¢ MCF sale for at least a portion of the time.

The Court finds this contention to be without merit. The 9¢ is a gathering fee. No royalty is paid on it. If it were not a gathering fee the laws of Arkansas and specifically Ark.Stats. 53–512 and 514 would be violated.

There is no contention or showing that any party intended to violate the law—and the parties have consistently regarded it as a gathering fee.

That brings us to the matter of prejudgment interest.

■ Bearing in mind that this is an action for declaratory judgment commenced by "LNT", the Court hereby announces and finds that under the conditions existing in this case, no pre-judgment interest should be awarded.

This is not a case where a definite result was indicated and a transit company with very able attorneys was trying to take advantage of the Sellers of natural gas. This is a case where both parties are well able to present their bona fide contentions. Both are able financially to procure the best of legal counsel and have done so. Neither side has tried to push the other one around. This was and is a bona fide dispute where each contender has vigorously contended for his position and it requires a court's declaration as to the effect of the Favored Nations Clause in each of "LNT's" contracts.

That court declaration is only being announced at this time. Accordingly, there should be no pre-judgment interest award by this declaration.

However, now that the effect of the questioned clause has been declared, this declaration will be without prejudice to any action or claim under adjustment in the future.

As appendices to this opinion are included the schedules submitted by the plaintiff showing amounts in controversy in this declaratory action proceeding.

All claims subsequent to the 45¢ figure are subject to proof as provided by the contracts between "LNT" and the sellers.

## A. TABLE OF AMOUNTS IN CONTROVERSY

### 1. Austral Contract @ .35¢ per m.c.f.

#### (4/1/72–12/31/74)

| Purchasers: | Purchases (m.c.f.) | Purchases ($) |
|---|---|---|
| D. J. Woods, et al | 4,636,049 | 417,244.41 [a] |
| All others in Walker Creek (not involved in this litigation) | 352,705 | 31,743.45 [b] |
| TOTAL | 4,988,754 | 448,987.86 |

Less Adjustments

| | | | |
|---|---|---|---|
| 1. | Pressure Base @ .0875¢ per m.c.f. | 4,988,754 | 43,651.60 |
| 2. | Royalty Payments @ .098¢ per m.c.f. | 4,988,754 | 48,889.79 |
| 3. | Fuel used in transportation @ .0035¢ per m.c.f. | 4,988,754 | 17,460.64 |
| 4. | Fuel to transport to Beacon @ .0025¢ per m.c.f. | 4,988,754 | 12,471.89 |
| TOTAL ADJUSTED LIABILITY | | | $326,513.94 |

(a) This amount is based on 4,636,049 m.c.f. calculated at a .09¢ differential (i. e., Austral contract price of .35¢ per m.c.f. less LNT contract price of .26¢ per m.c.f. for the period of April 1, 1972, through March 31, 1973.)

(b) This amount is based on 352,705 m.c.f. calculated at the same .09¢ differential for the same period of time as in (a) above.

2. Pennzoil-United Contract @ 45¢ per m.c.f.

(4/1/72–12/31/74)

| Purchasers: | Purchases (m.c.f.) | Purchases ($) |
|---|---|---|
| D. J. Woods, et al | 4,636,049 | 750,691.01[a] |
| All others in Walker Creek (not involved in this litigation) | 352,705 | 51,526.55[b] |
| TOTAL | 4,988,754 | 802,217.56 |

Less Adjustments

| | | | |
|---|---|---|---|
| 1. | Pressure Base @ .0875¢ per m.c.f. | 4,988,754 | 43,651.60 |
| 2. | Royalty Payments @ .098¢ per m.c.f. | 4,988,754 | 48,889.79 |
| 3. | Fuel used in transportation @ .0035¢ per m.c.f. | 4,988,754 | 17,460.64 |
| 4. | Fuel to transport to Beacon @ .0025¢ per m.c.f. | 4,988,754 | 12,471.89 |
| TOTAL ADJUSTED LIABILITY | | | $679,743.64 |

(a) This amount is based on 1,301,583 m.c.f. calculated at a .09¢ differential (*i. e.*, alleged triggering contract price of .35¢ per m.c.f. less LNT contract price of .26¢ per m.c.f.) for the period of April 1, 1972, through March 31, 1973; and 3,334,466 m.c.f. calculated at a .19¢ differential (*i. e.*, alleged triggering contract price of .45¢ per m.c.f. less LNT contract price of .26¢ per m.c.f.) for the period of April 1, 1973, through December 31, 1974.

(b) This amount is based on 154,874 m.c.f. calculated at a .09¢ differential for the period of April 1, 1972, through March 31, 1973; and 197,831 m.c.f. calculated at a .19¢ differential for the period of April 1, 1973 through December 31, 1974.