314 So.2d 516 (1975)
Dr. Allen JACKSON
v.
FONTENOT BUILDING, INC.
FONTENOT BUILDING, INC.
v.
Dr. Allen JACKSON.
Nos. 10259 and 10260.
Court of Appeal of Louisiana, First Circuit.
May 19, 1975.
Rehearing Denied June 30, 1975.
Writ Refused September 25, 1975.
*517 George & George, Ltd., James A. George, Baton Rouge, for Jackson.
Mengis, Roberts, Durant & Carpenter, Warren L. Mengis, Baton Rouge, Teddy W. Airhart, Jr., Baton Rouge, for Fontenot Building, Inc.
Before SARTAIN, ELLIS and BARNETTE, JJ.
BARNETTE, Judge.
On March 17, 1972 Dr. Allen Jackson entered into a contract with Fontenot Building, Incorporated whereby Dr. Jackson purchased certain facilities and equipment for the operation of a car wash business. By the terms of the contract he also leased from Fontenot the realty upon which the car wash facility was located.
Dr. Jackson brought suit against Fontenot May 18, 1973, seeking annullment and rescission of the contract based on allegations of lack of consent resulting from error of motive and fact and "false and/or fraudulent" representations bearing upon material facts and the principal reason for entering into the contract.
On March 14, 1974, Fontenot filed suit against Dr. Jackson seeking to invoke the acceleration clause of the lease agreement and for judgment in the amount of $28,755.50 with interest.
The two suits were consolidated for trial and are now before us on appeal by Dr. Jackson.
*518 The trial court judge gave written reasons for judgment. We are in complete agreement with him on every aspect of the case and find his statement of the case, the analysis of the issues, findings of fact and application of the pertinent law and jurisprudence to be complete in every respect and the conclusion reached well founded. We adopt the same as the opinion and judgment of this Court.
"In these consolidated suits the primary question at issue is whether or not Dr. Allen Jackson is entitled on the basis of error in the motive and/or fraud to nullify and rescind contracts entered into by and between himself and Fontenot Building, Inc., and by virtue of which he purchased a car wash structure with equipment and leased the realty upon which it is located.
"We find the following facts in this case. In 1971 Fontenot Building, Inc., through its President, Emery J. Fontenot, was contacted by William Maeser, Baton Rouge realtor, who inquired as to whether several car wash businesses owned by the corporation might be placed on the market for sale. Mr. Fontenot informed Maeser that he was not interested in selling certain locations but would consider selling others. The contact by Maeser did result in Maeser obtaining a listing agreement authorizing him to find buyers for the realty, structures and equipment at two locations, one on Acadian Thruway at Fairfields and one on Highland Road. While the exact details are unclear, it appears that Maeser asked Fontenot for certain financial information relative to the businesses so that he might pursue his role as broker. Fontenot's office did furnish Maeser with certain figures but the exact figures furnished and their precise source are not established. Mr. Fontenot's secretary had access only to sales tax reports and deposit records either or both of which would reflect gross receipts. Accounting records, such as profit and loss statements, were not available to the secretary. We can only conclude that the secretary did furnish Mr. Maeser with some information but did not have access to and could not, therefore, have furnished him with such proper accounting items as depreciation and operating expenses which would be necessary to reflect an accurate financial picture.
"Subsequently, Maeser made an appointment with Dr. Jackson for the purpose of discussing business. He at first attempted to get Dr. Jackson interested in buying apartment houses. Failing in that, he then attempted to interest Dr. Jackson in a combination lease-purchase arrangement of six car wash locations, including the two owned by Fontenot Building, Inc. In furtherance of the latter possibility, Maeser furnished to and discussed with Dr. Jackson the information shown on the exhibits introduced into evidence as Dr. Jackson 1, 2 and 3. These exhibits had been prepared by Maeser prior to his seeing Dr. Jackson.
"A close analysis of the three exhibits show conclusively that Maeser's initial approach to dealing with the Fontenot properties envisioned the lease of the land, not the sale thereof as authorized by the listing agreement. Also, the exhibits, corroborated by the testimony of Dr. Jackson, show that the Fontenot properties were only part of a single proposed deal involving all six businesses listed thereon. Investment aspects evidenced by the exhibits include such matters as rate of return, equity income, cost basis, taxable income, tax brackets, expenses, interest, depreciation and ownership. Clearly, the information evidenced by the aforesaid exhibits, as well as the lease-purchase vehicle proposed, is keyed to the type investment which has due regard for the minimizing of income taxes, including the possible reduction of income taxes on earnings from other sources. Additionally, the exhibits show *519 that three owners of the properties were apparently contemplated, that the car wash business in general was undergoing a sharp decline in recent years, and that the two properties of Fontenot in particular had suffered greatly decreased profits during the period from 1967 through 1971.
"Comparing the cash receipt figures on the aforesaid exhibits with those evidenced by Fontenot's sales tax reports which are also admitted into evidence establishes that the former are erroneous in that they greatly exceed the actual receipts. As stated, the exact source of these erroneous figures, as well as the expense figures, cannot be explained from the evidence. We are satisfied that Maeser informed Jackson that the figures were obtained from the various owners.
"At the first meeting between Jackson and Maeser, Jackson asked Maeser why, if it was such a good deal, didn't he join with him in buying the several locations. To this Maeser agreed and from thereon the two men proceeded together with their plans to engage in the car wash business. It was decided by them that they would limit their joint investment to the two locations owned by Fontenot and that Maeser would maintain and operate the premises. Maeser returned to Fontenot with proposals to effectuate the lease of the land and the purchase of the other assets. After negotiations, Fontenot agreed to lease and sell. Shortly before consummation of the deal it was ascertained that Maeser was having financial difficulties and it was then decided that instead of dealing jointly with the properties, Jackson would separately acquire the location at Fairfields and Acadian and Maeser would separately acquire the Highland Road location. Maeser, however, was still to operate and maintain both locations. With this final arrangement in mind, Jackson was advised by Maeser of a scheduled conference in the office of a local attorney for the stated purpose of discussing the transaction. Upon arriving, Jackson was somewhat surprised to learn that the real purpose of the meeting was to consummate the lease and purchase. The attorney, whose fee was paid jointly by Jackson and Maeser and who was in no way retained by or connected with Fontenot, completed the necessary documents and they were finally executed. Just prior to the execution of the documents, according to the testimony of Jackson (Tr. p. 90), he casually inquired of Fontenot `. . . somthing to the effect, are the figures accurate; do the Robos pay their own way, or something of that type, and he assured me that it did.' The figures on the cards in Jackson's possession were not shown to Fontenot by Jackson and it is not established that Fontenot and Jackson were ever mentally in accord as to any specific figures. It is established that the inquiry was of a most casual nature without any emphasis whatever as to its importance.
"Following the closing of the leases and sales to Jackson and Maeser, Maeser, with the assistance of his son, took over the operation of both car wash locations. This was as previously agreed to by Jackson and Maeser but a few days later the arrangement was terminated by Jackson.
"The evidence shows that Maeser subsequently dealt with certain third parties as regards the facilities he acquired from Fontenot. Also, according to Jackson (Tr. p. 93), approximately six months after the deals were closed with Fontenot, Maeser inquired of Jackson if the latter wanted to sell his car wash business to which Jackson replied in the negative. However, by letter dated January 30, 1973 (approximately ten and one-half months after the lease and sale), Jackson advised Fontenot that as of March 1, 1973, he would no longer be responsible for any expenses relating to the business *520 and would deliver to Fontenot the keys to the property at that time. Fontenot, through counsel replied that he would not agree to a cancellation of the contracts. Exhibits Dr. Jackson 8, 9. The respective suits ensued.
"Addressing ourselves to the summative fact determinations at issue herein, we conclude that no fraud has been legally established and that Dr. Jackson had several motives for entering into the contracts with Fontenot Building, Inc., the principal cause or motive being the tax advantages that were expected to accrue to him as a result of his leasing the realty and buying the car wash facilities. We do not find that net profit, or income determined upon the basis of standard accounting principles including depreciation expense, was a principal cause or motive. In discussing cause or motive we find it unnecessary to decide questions of agency which have arisen. For purposes of this decision we will assume that Maeser was the agent of Fontenot Building, Inc. throughout the events leading up to the execution of the contracts and that the furnishing of erroneous income figures by him to Dr. Jackson is imputable to Fontenot Building, Inc.
"Doctor Jackson originally sued only Fontenot Building, Inc., praying for judgment annulling and rescinding the contracts and for return of his initial down payment. The basis for his suit was lack of consent or error bearing on the principal cause of the making of the contracts, allegedly that the property was profitable to the extent represented. Jackson alleged that Fontenot Building, Inc. knew of or was apprised of this motive for entering into the contracts. Alternatively, Dr. Jackson alleged that Fontenot Building, Inc. knew or should have known that the information furnished him was false and/or fraudulent. The petition of Dr. Jackson was later amended to name William Maeser and Emery J. Fontenot as individual defendants. The amended petition elaborates upon the alleged principal cause of the contract as being `. . . the representation. . . of certain figures said to be the monthly profit figures showing the car wash operation was a profitable venture.' Then followed the rather strong assertion that: `At all times pertinent hereto defendants knew of and were apprised of petitioner's motive for entering into such contract and intended to present these false figures to petitioner, knowing they were false, in order to induce petitioner to enter into the contracts.' This latter allegation is tantamount to alleging fraud and rendered superfluous the alternative plea of fraudulent conduct. The original prayer was reiterated in the amendment and Dr. Jackson then prayed for damage awards against the individual defendants, alternatively.
"In holding that no fraud has been established herein, the Court has assessed the evidence in light of the very heavy burden of proof which must be borne by Dr. Jackson. We realize, as pointed out by counsel for Dr. Jackson in oral argument before the Court, that Dr. Jackson relies primarily upon error or mistake of fact that because of the gravity with which a charge of fraud is viewed, even if alleged alternatively, it is necessary that the Court be dispositive of the issue.
"One who alleges fraud has the burden of establishing it by legal and convincing evidence. Strong and conclusive proof is required. Such proof must be stronger than by a mere preponderance of the evidence. It is never imputed to anyone on evidence that is merely probable or of suspicious nature. It has even been held that fraud must be proved beyond a reasonable doubt. See Faris v. Model's Guild, 297 So.2d 536 ([La.App.] 1974); Packwood v. Johnson, 264 So.2d 663 ([La.App.] 1972); American *521 Guaranty Co. v. Sunset Realty & Planting Co., 208 La. 772, 23 So.2d 409 (1945); and, the authorities therein cited.
"While it has been proven that the figures presented by Maeser to Jackson as regards the car wash operation which Jackson ultimately acquired were grossly erroneous, it has not been proven, as alleged, that Fontenot or Maeser knew they were false and presented them to Jackson in order to induce him to enter into the contracts. It is abundantly clear from the record that other than authorizing his office to furnish Maeser with requested information, Fontenot had no knowledge whatsoever of any such figures. In fact, Fontenot had no personal contact with Jackson until he met him in the office of the closing attorney for the purpose of executing the contracts. At that time it is clear that Fontenot was not made aware of the pertinent figures that were included in the work-up of the several businesses noted on the index cards. With respect to Maeser, absent the strong affirmative proof of knowledge and intent requisite to the proof of fraud, it can only be surmised that he had reason to believe that the figures were correct. He admitted in his answer that he did pass on to Jackson figures that had been submitted to him. A plausible explanation might be that a mistake was made by Fontenot's secretary or by Maeser in his inclusion of the information into a work-up of the several businesses owned by different persons. Dr. Jackson testified that the figures on the card relating to the business on Florida Street owned by a Mr. Haynes were verified by Haynes as essentially correct. Tr. p. 60. There is no evidence of any of the other information on the cards being false. As mandated by the jurisprudence, this Court must refrain from imputing fraud to Maeser (and through him, as assumed agent, to Fontenot) even if the evidence is probable and of a suspicious nature. The fact remains that Maeser himself was willing to act as joint lessee and purchaser on the basis of the same information furnished to Jackson. It was not until just prior to closing that Dr. Jackson selected the particular location he acquired. From the evidence, it is not unreasonable to assume that Maeser would have himself taken that location had not Dr. Jackson, for extraneous reasons, selected it.
"Article 1847 of the Civil Code provides by way of definition:
`Fraud, as applied to contracts, is the cause of an error bearing on the material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other.' (Emphasis added.)
As defined, fraud has not been proven in this instance. It is really unnecessary, therefore, to consider the applicability of the rules enunciated by sub-parts 2, 3, 4, and 9 of Article 1847 which would otherwise be interpretative of the validity of the contracts sought to be annulled. Nonetheless, an analysis of those provisions afford no relief to Dr. Jackson. Even if we were to assume that Maeser knowingly presented false figures to Jackson, it was done without the knowledge of Fontenot and under C.C. 1847(9) neither Fontenot nor his corporate business can be held liable unless it is shown that the error bears on the principal cause of the contract. Fontenot did not practice an artifice, he did not procure Maeser to practice an artifice, nor did he have knowledge of any artifice practiced by Maeser. Further, assuming fraud or misrepresentation with respect to the income and expense figures furnished, such figures relate to the value of the object of the contract and under C.C. 1847(3) it is not such an artifice as will, under the facts of this case, invalidate *522 the agreement. C.C. 1847(3) provides:
`3. A false assertion as to the value of that which is the object of the contract, is not such an artifice as will invalidate the agreement, provided the object is of such a nature and is in such a situation that he, who is induced to contract by means of the assertion, might with ordinary attention have detected the falsehood; he shall then be supposed to have been influenced more by his own judgment than the assertion of the other.'
In this regard, it is to be noted that Jackson never talked to Fontenot prior to closing about the value of the business assets he was acquiring. A casual inquiry as to the correctness of some figures, without even showing Fontenot the figures, is the extent of Jackson's efforts to verify the value of that which he was about to acquire. Further information was available to Jackson. He did not ask for it. Proper accounting records were available to Jackson. He did not ask for those. It cannot be said that ordinary attention was given by Jackson to the ascertainment of value as reflected by the income and expense figures supplied him. There was no `difficult or inconvenient operation' necessary to discover the truth or falsity of the assertion as contemplated by C.C. 1847(4). Dr. Jackson's reliance upon his assertion of fraud cannot be upheld either factually or as a matter of law.
"The final segment of these reasons for judgment relates to our conclusion that the principal cause or motive of Dr. Jackson in entering into the contract which he now seeks to annul was the tax advantages that he expected to accrue therefrom; and that additional taxable income was not a principal cause or motive. A close study of the evidence in these consolidated cases reveals several causes or motives on the part of Dr.Jackson for acquiring the business facilities by lease and purchase. These and other relevant factors should be considered within the context of Articles 1823, 1824, 1825, 1826, 1827 and 1832 of our Civil Code, which we deem applicable.
"Civil Code Article 1825 provides:
`The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration without which the contract would not have been made.'
"There are several reasons given by Dr. Jackson for entering into the contracts. One such reason was that he felt he could rely upon the alleged knowledge and expertise of Mr. Maeser in the car wash business. In this regard, see pages 56, 82, 91, 94 and 102 of the transcript. It is clear that Dr. Jackson proceeded on the basis of joint acquisition with Maeser until shortly before the lease and sale. It is also clear that throughout the preliminary stages of the venture and past the point of confection of the documents, it was agreed and understood that Maeser would operate and maintain both car wash locations. Mr. Maeser did, in fact, have the responsibility for maintaining and operating Jackson's business for a few days following the sale and lease. Without question, there was reliance by Dr. Jackson on Maeser's stated assertions to him that he was experienced in the business. It cannot, however, be logically said that Dr. Jackson would not have contracted with Fontenot had he known the contrary was true. As can be seen from the next two causes or motives of Dr. Jackson which the Court treats, the knowledge and expertise of Maeser was not essential to the venture. We can only conclude that it was one of the factors which, when added with several others, motivated Dr. Jackson to contract.

*523 "The motive of Dr. Jackson for selecting the particular car wash location which he chose was that there was a family business in the same geographic area of the city with an allied function and with personnel which could easily adapt to the operation of the newly acquired facility. See pages 64, 65 and 82 of the transcript. Without elaboration, it is again clear that this was a factor in the thinking of Dr. Jackson but it was not such a consideration that was essential to the venture. It cannot be logically said that he would not have contracted had not this other convenient and compatible facility existed.
"Thirdly, Dr. Jackson had confidence that he could operate the facility he was acquiring in such a manner that it would be an asset. The confidence he possessed in his ability to do a good job was a subsidiary motive or cause for contracting. See page 84 of the transcript. This motive came to light when Dr. Jackson was questioned with regard to the known fact that the receipts from the Robo location in question were decreasing from 1967 through 1971. Parenthetically, the steady decline in gross receipts for other businesses shown on the cards furnished Jackson by Maeser is also relevant to the next cause or motive which the Court will discuss. See also page 125 of the transcript bearing on the transitional financial decline of the car wash industry at the time involved.
"The fourth discernable motive of Dr. Jackson for contracting was the expected profitability of the car wash facilities he was acquiring. Testimony relevant to this area of concern is found on pages 57, 63, 66, 80 and 81 of the transcript. Dr. Jackson did not make entirely clear his meaning or understanding of the terms `profit' and `income'. What he actually expected and desired must be construed from all the evidence in the case, including his own testimony. It is clear that Dr. Jackson wanted an investment that would not be to his financial detriment. The income figures on the card were of significance to him. And, it is admitted that he considered the income receipts from both of the car wash operations Fontenot sold, not from just the one he actually purchased. Reliance or expectation in this regard, therefore, was based upon at least two sets of receipt figures. It is difficult from the evidence to attribute single concern with the one pertinent set of figures. It is more probable that the broad picture deduced from the composite figures as to all six businesses shown on the cards had a more direct influence on Jackson's decision to get into the business of washing cars. There is no proof that profit figures relating to the other five businesses were false or exaggerated. The best insight into the importance of the income or profit motive of Dr. Jackson and his understanding of the terms is found on page 63 of the transcript. He was asked if he was, in fact, interested in the `income' that the property produced. His response was: `Yes, I think any philosophy that predicates a business venture on a loss is doomed to fail. I think you should make a profit and counteract that with your depreciation.' This answer demonstrates that Dr. Jackson was equating `income' with a sufficient cash flow to pay out-of-pocket expenses and not with a net profit figure after the item of depreciation was included as an expense. This would seem to be the import of the phrase `. . . and counteract that with your depreciation.' We are constrained to conclude that Dr. Jackson was not primarily interested in taxable income from his new venture, that he expected a sufficient cash flow for the business to be self-sustaining while at the same time having the obvious benefits of depreciation. As a matter of fact, as will be seen from the following discussion of what we have deemed to be the principal cause or motive, the concept of profit as taxable *524 income is counter-productive to using the business as a tax shelter, i. e., to reducing the tax burden on income from other sources.
"Exhibits 1, 2 and 3 offered in evidence by Dr. Jackson are, as previously stated, keyed to the type investment which stresses tax advantages. It is difficult to conclude otherwise in the face of an analysis based upon such items as rate of return, equity income, cost basis, taxable income, expenses, interest, depreciation and ownership. Testimony relative to tax advantages as a motive is found on pages 57, 58, 63, 64 and 81 of the transcript. At page 57, Dr. Jackson states, inter alia, that Maeser had done `. . . in other words, what would be the tax advantage of owning property of this type.' Referring to the `computer' tape, Exhibit Dr. Jackson-3, Dr. Jackson (Tr. p. 58) stated: `. . . and on the basis of that, I considered the investment to be of considerable merit.' This tape appears to the Court to be almost completely tax oriented.
"The most significant testimony of Dr. Jackson relative to principal cause or motive is found on page 62 of the transcript. Asked why he was interested in the car wash operations, he replied: `As an investment'. He then expanded:
`The basis for it was that I, year after year, was paying virtually a third to forty percent of my income in taxes, and I had no appreciable depreciation or other expenses that I could counteract my, I thought, heavy tax burden with, and I guess I was looking for something that would help me with my tax picture.'

Dr. Jackson then proceeded (Tr. p. 63) to clarify the various factors (rent, interest, and depreciation) involved `. . so that considerable tax advantage would have accrued to that operation had it been as it appeared to be.' Then follows the testimony previously quoted to the effect that you need to counteract `profit' with depreciation. Later in his testimony (Tr. p. 81), Dr. Jackson confirmed that in addition to considering the receipts from the two locations separately transferred to himself and Maeser, he also considered the write off of lease installments, interest payments, and depreciation. Concededly, Dr. Jackson has also testified that he would not have entered into the contracts had he known the gross receipt figures greatly exceeded the actual income. A preponderance of the evidence, however, establishes that his principal motive was to make an investment `. . . that would help me with my tax picture.' The two facts are not necessarily mutually exclusive. One may decide to refrain from an investment because a secondary motive or purpose cannot be achieved as he most certainly would refrain if his principal motive is unattainable. Such does not preclude differentiating between a principal cause or motive and a less important consideration. Weighing heavily against the position of Dr. Jackson that the attractive profit experience shown on the card resulting from false receipt figures was his principal motive for contracting is the fact that had the business shown such a profit, he would have added to his income as a physician thereby increasing the percentage of his tax burden on such income and defeating his stated purpose of finding `. . . something that would help me with my tax picture.' The two concepts cannot be resolved. They are contradictory.
"Further weighing against the aforesaid position is the fact demonstrated by all the figures and observed by Dr. Jackson. That fact would appear to be alarming to a person looking for an income producing business and it is that the comparative figures of all the car wash businesses noted on the cards, whether owned by Fontenot or not, showed a declining trend in profits. The facilities purchased by Jackson had declined in profits between 1967 and 1971 *525 by more than 100%. Perhaps a valid answer to this might be, as testified to by Jackson, that he felt he could do a better job than Fontenot. Yet, when considered in the light of the stated motive of tax advantages, the purchase of a rapidly declining business is more consistent therewith than with the idea of making money. Exhibits 6 and 7 introduced by Dr. Jackson (Schedule "C" of his federal tax return for 1972 and 1973) show the following. For that part of 1972 during which Dr. Jackson operated the business, he took in $5,306.37 and paid out $4,932.00. He had an excess cash flow of $374.37. For the same period, he took a depreciation of $6,022.88. During the short period during 1973 when Dr. Jackson operated the business, he took in $3,097.00 and paid out $1,699.00. His excess cash flow was, therefore, $1,398.00. For 1973, he depreciated the fixed assets in the amount of $8,682.00. For both periods the total depreciation was $14,704.88. We do not have the balance of Dr. Jackson's 1972 and 1973 tax returns. However, from these figures alone, Dr. Jackson received a tax advantage of $12,932.51. That much of his income as a physician was, in effect, not taxable thereby gaining him the one-third or forty percent thereof which he would otherwise have had to pay. This Court realizes that other unknown factors may well alter the result indicated but, of record, it does appear that the tax benefits expected were accuring and his principal motive for going into the venture was being fulfilled. At the same time, the debt assumed was being liquidated resulting in greater equity which would lend itself to a tax advantageous capital gain sale after all depreciation had been claimed. The actual tax experience of Dr. Jackson is, to say the least, consistent with the principal motive of tax advantages which we find as a matter of fact.
"Articles 1826, 1827 and 1832 of the Civil Code provide:
`No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.'
`But wherever the motive is apparent, although not made by express condition, if the error bears on that motive, the contract is void. A promise to give a certain sum to bear the expense of a marriage which the party supposes to have taken place, is not obligatory, if there be no marriage.'
`In all cases, however, when the information, which would have destroyed the error, has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract.'
Applying Articles 1826, 1827 and 1832 to the facts of these consolidated cases dictate the rejection of Dr. Jackson's basis for annulment and rescission. Even if we were to hold that the principal cause or motive for his contracting was the assertion of gross receipts and profit figures which were in fact false, Fontenot was clearly not apprised that such was the principal cause and the nature of the transaction is not such that it can be presumed that he knew it to be the case. To imply knowledge from the nature of this transaction would be tantamount to saying that in all cases where business assets are sold for operational purposes, the vendor knows that the buyer's principal motive is profit or taxable income. Admitting that in most cases it is, a knowledgeable businessman is well aware of other motivations, particularly investments for tax purposes. The Court must recall that in this instance the buyer and seller never even met until closing time, the original offer to sell both land and equipment was rejected and a counter-proposition by both Maeser and Jackson was negotiated, modified and then agreed upon. It is indeed difficult to *526 conclude that any particular motive was apparent to Fontenot. Nor can it be said that an apparent income motive can be imputed to Fontenot through Maeser because the latter's initial approach to Jackson was based primarily upon the concept of tax advantages. The same evidence precludes such imputation. And, reverting momentarily to the subject of fraud, Article 1832 of the Civil Code precludes same in this context because Fontenot did not withhold the information that would have destroyed the error.
* * *."
We omit a lengthy quotation in the Reasons for Judgment taken from trial brief on behalf of Fontenot Building, Inc. In the portion here omitted, among others, are citation of Marcello v. Bussiere, 284 So.2d 892 (Sup.Ct.1973) and Claiborne Butane Company v. Hackler, 138 So.2d 234 (La. App.2d Cir. 1962). In Marcello v. Bussiere a retired couple had obtained money from a mortgage on their home, which they sought to invest in a small bar-lounge business operation to provide security income. The Court found that to be their determining motive. After the purchase they learned that they could not obtain alcholic beverage license, which was a fact the seller knew or should have known. The Court found error in the principal motive which rendered the contract invalid. In Claiborne Butane Company v. Hackler the Court held that a certain representation that an ice-maker machine would pay for itself was only "the usual sales talk of any salesman" and was not a condition of the sale.
The trial judge in this case in reference to those two cases continued his written reasons for judgment as follows:
"Not unlike the representation made in Hackler that the icemaker would pay for itself is the one made by Fontenot to Jackson. `. . . I did ask him something to the effect, are the figures accurate; do the Robos pay their own way, or something of that type, and he assured me that it did.' (Tr. p. 90) If Dr. Jackson could not have gotten a governmental license to operate a car wash or if there had developed some like impediment to prevent the investment from being viable, and the impediment was either known or apparent to Fontenot, a different result would obtain in these cases.
"Absent Dr. Jackson prevailing in the suit he brought for annulment and rescission of the contracts, it is not seriously contested that Fontenot Building, Inc. has borne the burden of establishing its case for the accelerated rental of the realty, the amount of which is agreed to as an established fact in the pre-trial order entered into by counsel and of record.
"Fontenot Building, Inc., having established its case by a preponderance of the evidence in Suit Number 170,825; and, Dr. Allen Jackson, having failed to establish the case by a preponderance of the evidence in Suit Number 164,038; judgment will be rendered herein in Suit Number 170,825 in favor of plaintiff and against defendant, as prayed for therein; and, judgment will be rendered in Suit Number 164,038 in favor of defendants and against plaintiff dismissing plaintiff's demands at his costs."
For the foregoing reasons, the judgments in both cases are affirmed at appellant's cost.
Affirmed.