55 So.2d 775

INTERSTATE NATURAL GAS CO., Inc., et al. v. MISSISSIPPI RIVER FUEL CORP.

No. 40088.

Nov. 5, 1951.

Rehearing Denied Dec. 10, 1951.

McHenry, Lamkin & Snellings, Monroe, Finley & Lucas, St. Louis, Mo., for appellant.

Blanchard, Goldstein, Walker & O'Quin, Shreveport, for appellees.

LE BLANC, Justice.

This is an action on a contract in which Interstate Natural Gas Company, Incorporated, and Hope Producing Company, both Delaware corporations, plaintiffs, sue the defendant, Mississippi River Fuel Corporation, likewise incorporated under laws of Delaware, to recover an amount of $322,530.75 alleged to be due. (For the sake of brevity the plaintiffs will at times hereinafter be referred to as "Interstate" and "Hope", and the defendant as "Mississippi".) The claim of Interstate is for $240,267.50 and that of Hope $82,263.25.

The original contract sued on was entered into by the parties on August 1, 1929. By this contract the sellers, Interstate and Hope, agreed to supply the defendant, Mississippi, buyer, with twenty-two per cent of the requirements of its gas pipeline then being constructed from the Monroe and Richland gas fields in north Louisiana to St. Louis, Missouri. The term of the contract was for a period of twenty years from the date of the first delivery of gas into the line, delivery having actually commenced on November 21, 1929. The prices per thousand cubic feet to be paid for gas delivered over that period were fixed under the provisions of Section IX of the contract as follows: "For the first three (3) years, five cents (5¢); For the next two (2) years, six cents (6¢); For the next five (5) years, seven and six-tenths cents (7.6¢); For the next five (5) years, eight cents (8¢); For the last five (5) years, the price shall be determined from year to year at the beginning of each year by mutual agreement or arbitration, but shall not be less than eight cents (8¢)."

Gas was delivered and paid for at the prices set forth in the contract until November 21, 1934, the fifth anniversary date of delivery under the agreement, at which time the third step in the rate was to go into effect. Just prior to the anniversary date on which the price of gas was to be stepped up from 6¢ per M.C.F. to 7.6¢ per M.C.F.,

the sellers and buyers entered into an amendatory agreement on November 7, 1934, the pertinent part of which, as far as concerns the issue in this case, was as follows:

"During the year beginning November 21, 1934, the price to be paid to Sellers by Buyer for natural gas shall be 6¢ per thousand (1,000) cubic feet.

"After the price of natural gas has been fixed by agreement or arbitration for the last five years of the contract period pursuant to Article IX of said agreement of August 1, 1929, there shall be added to such price 1.6¢ per thousand (1,000) cubic feet, and such increased price shall be paid by the Buyer to Sellers until there has been purchased at such increased price a number of cubic feet of gas equivalent to the number of cubic feet of gas purchased by Buyer at the price of 6¢ per thousand (1,000) cubic feet during the year beginning November 21, 1934.

"When that has been accomplished the price for natural gas to be paid to Sellers by Buyer shall be the amount which has been fixed by agreement or arbitration, as provided in Article IX of said agreement of August 1, 1929, without adding thereto said 1.6¢."

This amendment was entered into by the parties because of the financial condition of the buyer, presumably brought about by the country-wide depression of the early thirties, and also because of the interlocking

interest of the sellers in the buyer corporation. This interest will be more fully set out later. Conditions remaining the same, similar agreements amending the original contract were entered into by the parties in regard to the payment for gas to be delivered during the years commencing November 21, 1935, and November 21, 1936. During this period the sellers delivered to buyer 20,158,172 M.C.F. of gas.

Plaintiff's petition is based upon the theory that under these amendments of the basic contract, they are entitled to recover 1.6¢ per thousand cubic feet (M.C.F.) of the price of gas sold to defendant allegedly at 7.6¢ from November 21, 1934, to November 20, 1937, and on which only 6¢ was paid. That is set out in Article 4 of their petition in which they specifically allege that by their written agreements "payment of the price or consideration to be paid by defendant for gas sold and delivered to it" during these periods "was deferred to the extent of 1.6¢ per thousand cubic feet of gas delivered during those intervals and made payable at the expiration of each calendar year in which gas was to be delivered during the annual periods of said original contract commencing November 21, 1944, in amounts calculated at 1.6¢ per thousand cubic feet of gas delivered during such respective periods (from and after November 21, 1944) until the aggregate of all deferred payments shall be fully paid and satisfied." That is the basis on which their demands rest and in plainer language, ac-

cording to this theory, payment of the balance of 1.6¢ per M.C.F. was deferred for ten years, and was payable as gas was delivered after November 21, 1944, at the rate of 1.6¢ per M.C.F., settlement to be made at the end of each year following November 21, 1944. This was to continue until the amount of gas delivered after November 21, 1944, equalled the amount of gas taken from November 21, 1934, to November 20, 1937.

Defendant filed various exceptions and pleas, principally of jurisdiction, estoppel and no cause of action, after which it filed its answer. The position of the defendant as revealed by its pleadings is that under the amendments of the basic contract, the gas for the period from November 21, 1934 to November 20, 1937 was not purchased by defendant at 7.6¢ per M.C.F., but was purchased by defendant at a flat rate of 6¢ per M.C.F.; and that nothing more was due at any time for any of the gas purchased during that period. It further contends that the amendatory contracts provided that, beginning with November 21, 1944, the price of gas to be purchased thereafter was to be 1.6¢ per M.C.F. higher than the rate which would have prevailed under the original contract; that the 1.6¢ increase which was to have gone into effect November 21, 1934, was to be increased by 1.6¢ as an integral part of the purchase price of gas delivered thereafter. It is defendant's position therefore that this could not have been payment of a debt remaining due from the period November 21, 1934 to November 20, 1937.

The significance of these opposing contentions is in the result to which each leads. If by the amendments defendant purchased at 7.6¢ the gas delivered from 1934 to 1937, and thereby contracted a debt of 7.6¢ per M.C.F. but paid only 6¢ thereof, so that at the end of 1937 there was still 1.6¢ per M.C.F. due for that gas with its mere payment postponed or deferred to 1944, then plaintiffs may recover. This is admitted by defendant as plaintiffs would then be recovering on a debt which accrued in 1937 but did not mature as to payment until 1944.

If, however, no debt for 1.6¢ was incurred prior to 1938, as a part of the price of the gas sold from 1934 to 1937, the defendant's position is that plaintiffs cannot recover, because all prices between these sellers and this buyer since 1938 have been regulated by the Federal Power Commission under authority of the Act of Congress adopted on June 21, 1938 known as the Natural Gas Act, 15 U.S.C.A. § 717 et seq., and plaintiffs have failed to apply to the Commission to put this increase into effect.

The trial judge, after having overruled all preliminary pleas and exceptions, heard the case on the merits and rendered judgment in favor of plaintiffs and against defendant holding that the amount claimed by plaintiffs was a debt which accrued during the years 1934–37 and payment deferred until the years 1944–et seq. From this

judgment, defendant-appellant has appealed.

The trial judge was undoubtedly impressed with the language of another amendatory contract between the parties dated January 20, 1937 which was executed at the instance of the buyers of ten million dollars of bonds, then to be issued by Mississippi River Fuel Corporation. The purpose of this agreement was to extend the contract for gas deliveries to February 2, 1952 and to insure that defendant's earnings for each year after January 1, 1944 (after depreciation, taxes, etc.) should equal 1.5 times the sum of the interest and sinking fund requirements of all bonds outstanding. It provided that if in any calendar year in which the price might exceed 8¢ the amounts collected should be found at the end of the year to have encroached upon the 1.5 ratio then the excess thereof should be adjusted by reimbursing buyer to such extent.

Section 4 provided: "The provisions of this agreement shall in no way relieve Buyer from its obligations under the agreements of November 7, 1934, November 19, 1935 and November 18, 1936, to pay in addition to the price fixed by agreement or arbitration under the article IX of said gas purchase agreement for the period commencing November 21, 1944 and ending November 20, 1949, an amount of 1.6¢ per thousand cubic feet for a quantity of gas equal to the quantity which Buyer has purchased at the rate of 6¢ per thousand cubic

feet under said agreements of November 7, 1934, November 18, 1935 and November 18, 1936; provided however that no part of said amount of 1.6¢ shall be added to the price of gas sold by Sellers to Buyer during any calendar year and then only in the event that the addition of said amount of 1.6¢ or any part thereof to the price for said gas shall not result in a price for the gas sold by Sellers to Buyer during such year in excess of that permitted by the provisions of paragraph (2) of this agreement. In the event that all or any part of said amount of 1.6¢ cannot be added to the price for gas sold by Sellers to Buyer during any year in said period without violating the provisions hereof the obligation of Buyer with respect to that part of said amount of 1.6¢ not so added shall be deferred from year to year until all or part of said amount of 1.6¢ can be added to the price without violating the provisions of such paragraph (2) of this agreement."

The first impression gathered from the trial judge's written reasons for judgment both on the plea of estoppel and on the merits is that he was of the opinion that the language, itself, of the amendatory contracts revealed the intention of the parties. In his written opinion on the merits he stated as follows:

"Therefore this court shall be inclined to construe the agreements in a manner as to best effectuate the intention of the parties expressed therein, and in so doing may refer to circumstances under which the

contracts are made. It should look back at the entire meaning of the instrument so that it as a whole and not specific excerpts must control. An interpretation should be favored which would make every part of the contract effective.

"A full consideration of the several writings quoted above has led me to the conclusion that the amount allegedly owing by defendant is a debt which ought to be paid. This conclusion flows from the following inferences; First, it is evident the parties did not abandon the 7.6¢ rate stipulated in the 1929 gas purchase agreement, and in effect the amendatory contracts of November 7, 1934, November 19, 1935 and November 18, 1936 did preserve said rate subject to a provision for payment of 1.6¢ thereof in the future; second in reality the 1.6¢ provision constituted a provision for deferred payment as contra-distinguished from a deferred price increase, and this is manifest from the text of the several agreements so circumscribing the 1.6¢ factor. It is consistently kept apart from the obligation arising from the price to be fixed by agreement or arbitration for the 1944-1949 period. Thus the 1.6¢ per M.C.F. was tied to the quantity of gas delivered during the years beginning November 21, 1934, 1935 and 1936. It was not intended to become part of the price of gas to be delivered during 1944-1949. For instance, the November, 1934 agreement says:

"'After the price—has been fixed by agreement or arbitration—there shall be added to such price 1.6¢—to the amount of cubic feet—purchased at—6¢—during the year beginning November 21, 1934.'

"The contract of January 20, 1937 also indicated a desire to keep separate and apart the two obligations. Section 4 thereof made it clear that defendant was not being relieved of its duty to pay the 1.6¢, then declared:

"'In the event that all or any part—of 1.6¢ cannot be added—the obligation of Buyer with respect to that part of said amount of 1.6¢ not so added shall be deferred from year to year until all or part of said amount of 1.6¢ can be added—'

"Thus handling of payment of the 1.6¢ was on an entirely different basis from that of the agreed or arbitrated price for gas to be delivered during the 1944-1949 period. In postponing the 1.6¢ the agreements were attempting to fix a time of payment thereof convenient to the ability of the defendant to pay as modified by the 1937 agreement to maintain the 1.5 earnings rates."

Even so, we find him next considering the facts and circumstances surrounding the making of these various contracts and the testimony and proof relating to the manner in which they were carried out. Especially did he appear to give much weight to a letter dated August 1, 1929, from which the supplemental contracts originated.

Whilst our impression, gained from the language of the contracts themselves, is different from that of the trial judge, we, like him, will refer to these matters in order

to support the conclusion we have reached. More particularly are we concerned with the manner in which the parties executed their agreements for this, according to Art. 1956 of the Civil Code, where the intent of the parties is doubtful, furnishes a rule of interpretation.

In order to fully understand the circumstances under which these amendatory contracts or agreements were made it is necessary to relate a little of the historical background of the defendant corporation. Shortly after it commenced its operations the country encountered a severe business and economic depression and the defendant corporation found that its revenue was insufficient to meet operating expenses and requirements for bonds issued in 1929 to construct its main pipe-line. This condition required it to receive financial assistance which could come either through sufficient loans to meet its obligations or by a corresponding reduction in its cash outlay.

Because the producer companies supplying Mississippi with its total supply of gas owned all of Mississippi's stock they were faced with deciding whether to advance funds as needed or, as an alternative, reduce or postpone current payments for gas supplied until such time as the company could fully meet its cash demands.

Mississippi River Fuel Corporation had been organized in 1928 and all stock therein subscribed to by certain producers of natural gas operating in the Monroe and Richland fields. The amount of stock taken by each producer was proportioned to the quantity of gas to be purchased from such producer. The companies participating therein were Interstate Natural Gas Company, Inc., Hope Producing Company, United Carbon Company, Southern Carbon Company, the Palmer Corporation of Louisiana, Moody-Seagraves and Industrial Gas Company. Interstate and Hope were then and now are subsidiaries of Standard Oil Company of New Jersey; Southern Carbon Company was a subsidiary of Columbia Carbon Company; and Palmer, Moody-Seagraves and Industrial Gas were shortly thereafter merged with United Gas Public Service Company. When Mississippi began its operations top personnel was largely supplied by Standard Oil. This resulted in certain individuals serving in executive capacities in Interstate, Hope and Mississippi simultaneously. Thus, Mr. F. H. Lerch, Jr., was a director and vice-president in Interstate and vice-president and treasurer of Mississippi. Mr. William A. Dougherty was for a period a director and vice-president of Interstate and Hope, and has served as attorney for all three companies since 1933.

In order for Mississippi to continue its operations during the depression, the producer-stockholders first made loans to it from time to time until in 1934 it was indebted to the companies which owned its stock to the extent of some $3,000,000. Prior to the agreement of November 7, 1934 sellers had insisted upon maintaining the prices as fixed in the contract of August 1, 1929, and on November 21, 1932, the

specified price change from 5¢ to 6¢ was observed. However, as the next step, that is, the November 21, 1934 price increase from 6¢ to 7.6¢ neared, the matter of continuing the advances or reducing current payments from the sale of gas was considered and resulted in the adoption of the first amendatory contract, the one of November 7, 1934.

Plaintiffs introduced a letter from Mr. F. H. Lerch to Mr. Dougherty, counsel for the company which they contend show the intention of the parties that the liability for the 1.6¢ increase was merely deferred until a later date. This is the letter which we stated before seems to have strongly impressed the district judge. It is as follows:

"In line with our conversation this morning, will you please prepare a short agreement to be executed by the various Producers delivering gas to Mississippi River Fuel and permitting a continuation for one year of the present 6¢ rate per m. c. f. for gas delivered by the Purchaser to Mississippi according to the existing contract. This rate changes on November 21, 1934 from 6¢ to 7.6¢. The agreement should be drawn in such a way so as to permit the collection of the 1.6¢ deferred at that time at some future date. I would suggest that inasmuch as the contract provides that a price shall be agreed upon after the first fifteen years of firm prices, that the first year of such term when the agreed to price goes into effect that such price be increased arbitrarily 1.6¢ and such in-crease to stay in effect until an amount of gas has been purchased equivalent to the amount of gas purchased at 6¢ after the contract period would normally have fixed a price of 7.6¢;

"It is planned to send this agreement, when drawn to Mr. McGowen for his approval, after which it will be discussed with Messrs. Carr and Nelson."

The language can be interpreted to mean that the 1.6¢ to be taken off the price which was to go into effect on November 21, 1934, was not to remain as a balance due on the purchase price at that time to be collected in ten years but was instead to be treated as an increase in, and added to the price that was to become effective in 1944. But even if it be assumed that the language imported some other meaning such as plaintiffs now contend it did, certainly the contracts drawn up by Mr. Dougherty do not provide for any deferred payments of part of the price for gas in 1934–5–6–7 to be collected at some date ten years later.

Defendant on the other hand relies strongly on a letter written by Mr. W. A. Dougherty, general counsel for both Mississippi and Interstate and Hope addressed to Messrs. Price, Waterhouse & Company, the auditors for the three companies, dated March 12, 1935, and here quoted in full: "Referring to the contracts whereby Mississippi River Fuel Corporation purchases gas in the Monroe, Louisiana gas field from Southern Carbon Company, United Carbon Company, United Gas Public Serv-

ice Company, Interstate Natural Gas Company, Incorporated, and Hope Producing Company under agreements entered into August 1, 1929, as modified by supplemental agreements entered into August 7, 1934 with Southern Carbon Company, August 10, 1934 with United Carbon Company, August 21, 1934 with United Gas Public Service Company, and November 7, 1934 with Interstate Natural Gas Company, Inc.-Hope Producing Co., the only liability which Mississippi River Fuel Corporation has for the purchase of natural gas for the year beginning November 21, 1934 is 6¢ per 1,000 cubic feet. The obligation to pay 1.6¢ as set forth in the supplemental agreements, does not arise until gas is taken during the last five years of the original contract period. If, for example, the contracts should be cancelled before that time there would be no liability whatsoever on the part of Mississippi River Fuel Corporation to make any payment with respect to said 1.6¢. From a legal standpoint it is not a deferred liability and no reserve should be set up with respect thereto."

Mr. Dougherty and Mr. Lerch attempted to explain the contents of that letter by stating that it relates to whether or not some liability ought to be shown on the balance sheet and that it was merely for statement purposes. In view of the explicit language to the effect that the *obligation* to pay the 1.6¢ as set out in the amendatory agreements *would not arise until the last five years of the original contract period* and that from a *legal* standpoint it was not a *deferred* liability and no reserve should be set up with regard to it, the explanation of the letter given by these two witnesses strikes us as being rather vague and unsatisfactory. Especially is this so in the case of Mr. Dougherty who himself had prepared the supplemental agreements and who also wrote the letter. His manner of expressing in his letter at that time, *that there would be no liability whatsoever* for this 1.6¢ in the event of the cancellation of the contract before the last five year period impresses us as a far more reasonable explanation than the one that is now offered.

It is admitted on the part of the plaintiffs that never, since the period beginning November 21, 1934, did they carry any obligations or deferred payments, as they now claim, on their books, statements or balance sheets, although they were on an accrual basis. And in this connection it may be said also that the books or statements of the defendant do not ever reflect any such liability on its part. According to the testimony of Mr. Charles J. Schuttleworth, Vice-President and Treasurer of that corporation, they were never billed for any such price increase and, he states the 1.6 factor was never shown or recorded as part of the operating cost of gas for the years 1934 to 1937. The statements rendered by plaintiffs, photostats of which appear in the record, for the amounts due for gas delivered each month, all contain the price of 6¢ per M. and bear no notation whatsoever regarding any additional price to be paid

at some future date, and remittances were made regularly and accepted without reservation for the amount carried on each monthly statement.

Interstate maintains a contract file which contains in summarized form the essentials of its gas contracts. This file also contained a tabulation dated December 9, 1937 showing the quantities of gas delivered for each of the three years and the total for the three years ending November 20, 1937 for each company. In addition, the tabulation, included the following summary:

Excess value or amount to be absorbed:

| | | |
|---|---|---|
| Interstate | ·15,016,719 x ·1.6¢ — | $240,267.50 |
| Hope | 5,141,453 x 1.6¢ — | 82,263.25 |
| | 20,158,172 | $322,530.75 |

In January 1946, Mr. George A. Wilson became president of Interstate and in November of the following year the matter of the existence of the amendatory contracts of 1934–5–6 and 7 was brought to his attention. Mr. Wilson states that Mr. Dougherty brought it up before the Board of Directors for any action deemed advisable. This seems to be the first time the matter was called to the attention of anyone. After investigation, Mr. Wilson concluded that the obligation had matured and that steps should be taken to collect the amount of money represented by 1.6¢ portion of the price of the gas delivered during the three years beginning November 21, 1934. · On January 21, 1948, he. addressed a letter to Mr. Ben C. Comfort, President of Mississippi River Fuel Corporation which constituted the first demand ever made for the alleged deferred obligation. In his letter he enclosed a copy of the tabulation of gas deliveries covering the three year period in question containing the same summary just referred to and which carries the heading "Excess value or amount to be absorbed". Mr. Lerch was the only witness who was examined regarding this statement. At first he said he did not know what was meant by the designation of the amount being one that was to be absorbed. Otherwise he appears as being rather evasive about the matter. We believe that this statement supplies another link in the chain of circumstances surrounding all transactions between the parties. Having remitted 1.6¢ of the basic contract price of gas for the three years in question the sellers who, as before stated, operated on an accrual tax reporting basis, must have felt justified in not carrying the amount on their books as they evidently did not consider it an existing asset so they simply absorbed it as of that time which, to us, was thoroughly consistent with the terms of the amendatory contracts under which the same amount was to be added, as a price increase, to the gas deliveries to be made some ten years later.

The trial judge overruled the defendant's plea of estoppel on the ground that defendant failed to disclose how the forbearance of plaintiffs had caused it prejudice. Because of the conclusions we have reached we do not find it necessary to pass on that plea. Our opinion is that

the amendatory contracts are definite in stating that the price of gas shall remain at 6¢ per M.C.F. during their ensuing years and that the price increase shall go into effect in 1944 and the following year. When all the circumstances surrounding the agreements are examined and the manner of their execution by the parties considered, we conclude that the intention was to treat this amount claimed not as an accrued debt but rather to make it a part of the price schedule beginning with the year 1944. At the time of the initiation of these agreements the parties did not and could not foresee that the Federal Government would regulate the Natural Gas Industry as it later did. As far as they were concerned they would have accomplished the same result in the final analysis, had the industry not been regulated, and in as much as, in our opinion they did not wish to burden their accounts with this liability or asset until they were sure of the financial standing of the defendant corporation, which they would have had to do had they chosen the course which they now claim they did choose, we are fortified in the conclusions reached and hold that no liability such as the one claimed exists.

Plaintiffs have raised a contention with regard to the sale of industrial gas which was not regulated by the orders of the Federal Power Commission. They point out that in the case of Hope Producing Company, unregulated gas delivered by it was sold by Mississippi and that with respect to such gas the order was not in effect and Hope should be allowed to collect the increased price under defendant's own theory of the case. That, however, is an entirely new issue which plaintiffs raised for the first time some four months after evidence had been closed. It was urged in a motion to reopen the case which was met by an opposition filed on behalf of defendant. We think the opposition was well taken and should have been sustained. It may be that plaintiffs have some such valid claim to assert but it cannot be considered in this proceeding where the issue was closely drawn and restricted to the points herein discussed.

For the reasons stated the judgment appealed from is now avoided, reversed and set aside and it is further ordered, adjudged and decreed that there be judgment in favor of the defendant and against the plaintiffs rejecting their demands and dismissing their suit at their costs.

HAWTHORNE, J., absent.