359 So.2d 255 (1978)
Frank J. HALL et al., Plaintiffs-Appellants,
v.
ARKANSAS-LOUISIANA GAS COMPANY, Defendant-Appellant.
No. 13549.
Court of Appeal of Louisiana, Second Circuit.
May 1, 1978.
Rehearing Denied June 6, 1978.
*258 Wiener, Weiss, Madison & Howell by James Fleet Howell, Shreveport, for plaintiffs-appellants Frank J. Hall, et al.
Blanchard, Walker, O'Quin & Roberts by Robert Roberts, Jr., Marlin Risinger, Jr., W. Michael Adams, Shreveport, for defendant-appellant Arkansas-La. Gas Co.
Before PRICE, MARVIN and JONES, JJ.
En Banc. Rehearing Denied June 6, 1978.
PRICE, Judge.
Plaintiffs seek damages for an alleged breach of contract by defendant for failing to escalate the price of gas purchased from them in accord with a price adjustment provision contained in a long-term gas purchase contract.
Plaintiffs are either independent producers or owners of various mineral interests under numerous leases producing natural gas in the Sligo Gas Field of Bossier Parish. Defendant, Arkansas Louisiana Gas Company (Arkla) is a large integrated gas utility company, which engages in exploration, production, transmission, purchase, and sale of natural gas and its by-products. Arkla has for many years been a major purchaser of gas in the Sligo Field.
The gas purchase contract forming the basis for this litigation was executed in 1952 between Arkla and several independent producers pursuant to a lengthy renegotiation of an existing contract which had been in effect since 1937, and which would have expired in 1954. Although all of the multiple plaintiffs herein were not original parties to the 1952 contract, they have subsequently become parties subject to the agreement by amendment or by operation of law. The 1952 agreement obligated plaintiffs to sell all of the gas produced or owned by them in the Sligo Field to Arkla for a period of twenty-eight years and provided for a fixed schedule of prices per MCF to be paid for raw gas throughout the period of the contract. The agreement further contained a price adjustment provision referred to in the contract as a "Favored Nations Clause," providing:
(D) If at any time during the term of this agreement Buyer should purchase from another party seller gas produced from the subject wells or any other well or wells located in the Sligo Gas Field at a higher price than is provided to be paid for gas delivered under this agreement, then in such event the price to be paid for gas thereafter delivered hereunder shall be increased by an amount equal to the difference between the price provisions hereof and the concurrently effective higher price provisions of such subsequent contract; provided that in determining whether a given price is in fact "higher" than the price provision of this contract, the inquiry shall not be limited to the actual prices stipulated but due consideration shall also be given to a comparison of all other pertinent provisions of the two contracts, such as point of delivery, basis of measurement, taxes, dehydration, and delivery pressures (provided that the number of years stated as the terms during which the two contracts shall respectively remain in force and effect *259 shall not be a factor to be considered for purposes of comparison under this paragraph) and the price to be thereafter payable in accordance with this paragraph for gas delivered hereunder shall be adjusted accordingly insofar as may be necessary to make allowances for any discrepancies as may exist between such comparable provisions of the two contracts. It is agreed that any such higher price for gas delivered hereunder shall be effective on the first day of Buyer's accounting month (as elsewhere herein defined) next following the effective date of such subsequent contract, all subject, however, to any rules and regulations of the Office of Price Stabilization or any other regulatory body having jurisdiction.
In February 1961 Arkla acquired, as lessee, a fifteen percent interest in an oil and gas lease granted by the United States on approximately 2,400 acres of land owned by it in the Sligo Field. Arkla participated with its colessees in drilling for and producing gas in substantial amounts from this leased acreage. Arkla has taken its fifteen percent share of the gas produced into its own processing plant in the Sligo Field and disposed of it through its own distribution system including transmission through an interstate pipeline. The lease from the United States stipulated a royalty to be paid by the lessees of a percentage of the oil or gas production obtained or, at the option of the United States, a payment in money by the lessees of the fair market value attributed to its percentage of production. The government has continuously elected to be paid a "value royalty," and in accord with the right reserved by it to have the Secretary of Interior establish the reasonable minimum value of gas for computation of royalty due, the price determined and ultimately acceded to by Arkla was and has continued to be in excess of that being paid plaintiffs under the 1952 contract.
Plaintiffs brought this action in October 1974 alleging that the payment of the higher price to the United States by Arkla beginning in 1961 activated the provisions of the Favored Nations clause of the 1952 contract and obligated Arkla to increase the purchase price paid plaintiffs commensurate with the price paid the government.
Plaintiffs seek compensatory damages and an accounting from Arkla alleging that it was in bad faith in intentionally concealing from them for fourteen years that a higher price was being paid for gas to the United States.
Arkla filed appropriate responsive pleadings questioning the jurisdiction of the state court alleging that the gas purchases in question have always been subject to the provisions of the Natural Gas Act, and solely within the jurisdiction of the Federal Power Commission (FPC), which has since been superseded by the Federal Energy Regulatory Commission (FERC). Arkla's attempt to have the case removed to the Federal District Court on that basis was denied.
In answer to the original and several amended pleadings of plaintiffs, Arkla denied it had triggered the Favored Nations clause of the 1952 contract by payment of an amount for gas to the United States which exceeded that being paid plaintiffs since the payment to the United States was solely a "rental royalty" and not a purchase of gas from another "party seller" as required for activation of the price adjustment provision.
An exception of no cause of action was filed by Arkla against the claim of one of plaintiffs, W. E. Hall, Jr., on the basis that he executed an amendment to the contract dated May 25,1969, which deleted the benefit of the Favored Nations clause as to him. Hall through responsive pleadings contends the amendment by him was ineffective because it was executed in error as he had no knowledge at the time that Arkla had previously breached the contract by paying the higher price to the United States.
After a very lengthy trial on the merits[1], the district court sustained the exception of *260 no cause of action as to the claims of W. E. Hall, Jr., and dismissed his demands. The court rendered judgment for all other plaintiffs as follows:

 Frank J. Hall $135,413.44
 Virgil J. Hall 36,930.88
 Carlyle W. Urban, Trustee
 under Will of H. M. Harrell 202,954.56
 John K. Harrell, Sr. 25,368.96
 James E. Harrell 25,368.96
 Elva L. Weiss 56,853.12
 National American Bank,
 Executor under Will of
 Seymour Weiss 56,853.12
 T. F. Philyaw 1,187.84
 W. O. Cochran 4,644.16
 D. B. McConnell 42,301.76
 James A. Noe, Jr. and C. T.
 Munholland, Testamentary
 Executors under Last Wills
 of Mr. & Mrs. James A. Noe 153,128.96
 S. G. Myers 130,215.91
 Asa Benton Allen 21,530.24
 Elaine Allen 20,874.88

There are several issues on appeal which can be generally categorized as follows: (1) whether the Federal Energy Regulatory Commission has the sole and exclusive subject matter jurisdiction; (2) whether the Favored Nations clause was activated when defendant paid value royalty at a higher price to the United States than it paid for gas purchases to plaintiffs; (3) whether W. E. Hall, Jr., validly waived his interest in the Favored Nations clause when he signed an amended contract in 1969; and (4) whether the award of damages by the trial court was correct.
I. JURISDICTION
The threshold issue on appeal is whether the trial court had proper subject matter jurisdiction to entertain this suit. Defendant contends the trial court lacked the power and authority to determine the rate at which natural gas was or is sold in interstate commerce since the rate-making function is vested solely and exclusively in the FERC by the Natural Gas Act. Defendant further contends that the FERC has primary jurisdiction to determine the contractual issue of whether the Favored Nations clause of the 1952 contract was activated by its payment of value royalty to the United States. Neither of these contentions can be maintained. Defendant's initial argument is in error because the relief sought is not that of a rate increase, but is instead a claim for damages arising under state contract law. Although the state court must adhere to the provisions of the Natural Gas Act and the pertinent regulations of the FERC in its determination of damages, it is a proper forum for adjudication of a state contract law dispute. Furthermore, the Natural Gas Act evinces no purpose to abrogate private rate contracts. United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). The act recognizes the rights of the parties to rates established by individual contract and does not alter ordinary contractual relationships where the controversy is one of ordinary contract law. Cities Service Gas Company v. Federal Power Commission, 10 Cir., 255 F.2d 860, cert. den. 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958); Skelly Oil Co. v. Federal Power Commission, 10 Cir., 532 F.2d 177 (1976); Phillips Petroleum Co. v. Federal Power Commission, 10 Cir., 349 F.2d 535 (1965). A claim founded on state contract law does not lose its character just because the Natural Gas Act is in some way involved. Pan American Petro. Corp. v. Superior Court of Del, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961).
Defendant's contention that the FERC has primary administrative jurisdiction to decide this contract dispute is also in error. In recent years the doctrine of primary administrative jurisdiction has been refined to apply to claims involving the special competence and expertise of an administrative body. Montana-Dakota Util. Co. v. Northwestern Pub. S. Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951); Best v. Humboldt Placer Mining Company, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); United States v. Western Pacific Railroad *261 Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). State courts do have jurisdiction to determine matters of contract law not within the specific technical expertise of the FERC. Pan American Petro. Corp. v. Superior Court of Del., supra. The major issue in the case before us is one of construing the provisions of a contract and the intentions of the parties at the time of the execution of the contract. Such a determination does not require the specific technical expertise of the FERC. Although the FERC may have original jurisdiction in this case, it does not have exclusive original jurisdiction, but rather shares concurrent original jurisdiction with the state court.
II. ACTIVATION OF THE FAVORED NATIONS CLAUSE
Plaintiffs contend payments made to the United States by defendant in its dual capacity as lessee and pipe-line purchaser are tantamount to a "purchase from another party seller," as this term was intended in the price adjustment clause of their 1952 gas sales contract with defendant. Defendant contends the payments were royalty or rent being paid in its position of lessee and not a purchase because the United States had no title to any gas produced under the lease, it having continuously elected to accept a value royalty on the gas produced.
We recognize that the theory of ownership and classification of lease royalty payments as rent as urged by defendant is in accord with the prevailing state law and federal decisions on this issue. See Shell Petroleum Corp. v. Calcasieu Real Estate & O. Co., 185 La. 751, 170 So. 785 (1936); Logan v. State Gravel Co., 158 La. 105, 103 So. 526 (1925); Board of Com'rs. of Caddo Levee Dist. v. Pure Oil Co., 167 La. 801, 120 So. 373 (1929); Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956). Mobil Oil Corporation v. Federal Power Commission, 149 U.S.App.D.C. 310, 463 F.2d 256 (1971), cert. den. 406 U.S. 976, 92 S.Ct. 2413, 32 L.Ed.2d 676 (1972).
We nevertheless find it inappropriate to accept the technical and restrictive interpretation on the term "purchase from another party seller" relied on by defendant under the circumstances shown in this instance.
The evidence shows that during the lengthy negotiations between defendant and the principal plaintiffs in 1952, defendant's prime objective in renegotiating the preexisting contract was to commit the plaintiffs to a long-term contract. As an inducement for a twenty-eight-year-term the officials of the defendant corporation offered to include a Favored Nations clause. The request by plaintiffs to have the clause pivot on the highest market price being paid by anyone in the field was rejected by defendant.
The handwritten notations made at that time by the defendant's attorney who prepared the final draft of the agreement show that his instructions from the official of defendant handling the negotiations were to prepare a price adjustment clause based on "highest price we pay for gas in the Sligo Field." Thereafter, agreement on the subject clause was reached which tied it to the highest price being paid by defendant in the Sligo Field.
There is no evidence suggesting the description of the contracting parties as "Buyer" and "party sellers" was intended to have any restrictive legal meaning and the terms were apparently standard phrases contained in a Favored Nations clause of another contract used as a model by the attorney drafting the agreement. Indicative of the fact that little thought was given to these terms having any significant restrictive effect on the broad application of the clause is the absence of a definition of the words "Buyer" and "party seller" within the agreement. Although defendant strenuously urges that the terms "Buyer," "seller," and "purchase" as used in the Favored Nations clause has a restrictive legal meaning and limits the applicability of the clause to "sales" of gas, defendant's actions subsequent to execution of the contract show a tendency on its part to use sales terminology in a very broad manner to also include royalty interests in the preparation of division orders and the payment of royalty *262 to lessors from a bank account styled "Gas Purchase Account."
The general rule of contract interpretation concerning a Favored Nations clause is that "in order to give effect to the intention of the parties, the Court must consider the circumstances surrounding the making of the contract, its subject, and the situation and relation of the parties at the time of its making; and the construction placed upon the contract by the parties to it as reflected by their words and acts is entitled to great, if not controlling influence in ascertaining the parties' understanding of its terms." [emphasis added] Louisiana-Nevada Transit Co. v. Woods, D.C., 393 F.Supp. 177 (1975).
The basic purpose of a price adjustment or Favored Nations clause is to protect a seller from discrimination by the pipe-line purchaser of gas under a long-term contract. Eastern Petroleum Company v. Kerr-McGee Corporation, 7 Cir., 447 F.2d 569 (1971); Louisiana-Nevada Transit Co. v. Woods, supra. As it is intended for the protection of the seller, the clause should be broadly construed to effectively carry out this purpose. Therefore, to exclude the substantial amounts paid to the government by defendant as having any bearing on the price being paid for gas by defendant in this field because of a technical semantic classification of the payment as being rent royalty would render the protection intended to be afforded plaintiffs by a price adjustment clause meaningless.
The factors affecting our decision on this issue are analogous to those presented in Eastern Petroleum Company v. Kerr-McGee Corporation, supra, in which the court found a payment of royalty to the state of Arizona under a lease of public lands to activate a Favored Nations clause in a contract providing that payment for gas "shall never be less than the price paid by Buyer to other sellers of helium-bearing gas from leases or lands in the same general area." The defendant pipe-line purchaser in that case contended the payment of royalties to the state was not a "price" paid to another "seller" within the meaning of the contract as the gas was "owned" by the lessee at the time it was reduced to possession. The court found it unnecessary to decide whether the payment under the lease to the state was a purchase of gas or royalty as either classification was within the purpose and intent of the price adjustment clause of the contract before it. As we are unaware of any appellate decisions in this state concerning the interpretation of such unusual contractual provisions, we are constrained to follow the federal jurisprudence in resolving this question.
For the foregoing reasons, we conclude the trial court was correct in holding that the payment by defendant for gas produced under the lease from the United States was within the scope of the price adjustment clause of plaintiffs' contract.
III. WAIVER OF FAVORED NATIONS CLAUSE BY W. E. HALL, JR.
On May 25, 1969, W. E. Hall, Jr., one of the numerous plaintiffs herein, executed an amendment to the 1952 gas purchase contract wherein he deleted his interest in the Favored Nations clause. Defendant asserts plaintiff's waiver as an affirmative defense against his claim for damages arising under the price adjustment clause. Plaintiff contends the waiver was ineffective because he executed the amendment under an error of fact induced by defendant's misrepresentations and concealment of the true facts causing him to believe the price adjustment clause had not been activated. Plaintiff contends he would not have deleted the clause had he known of the higher prices being paid by Arkla to the government. However, plaintiff's testimony reveals that in 1969 Hall had an interest in a well under contract to Texas Gas Producing Company with gas produced therefrom being sold to the latter. At that time the well had nearly depleted, and the pressures were dropping. In order to keep from having to cap the well, Hall contacted defendant who agreed to take over the well and use its pipe lines wherein the pressures would be lower, thus allowing the well to keep producing. In order to contract with *263 defendant, plaintiff had to execute an amendment deleting the Favored Nations clause to comply with the FPC's more recent regulations prohibiting the inclusion of such a clause in a gas purchase contract. By using defendant's pipe lines, Hall was able to sell the gas without having to compress it. He testified that the main reason for executing the contract was to keep selling the gas without having to buy and operate a compressor to compress the gas.
The Louisiana civil code articles dealing with error of fact (C.C. Arts. 1820-1845) provide that a contract will not be considered invalid unless there was error as to the "principal cause," or "motive," for making the contract. C.C. Art. 1825. In this case the principal motive for W. E. Hall, Jr.,'s signing the contract was to continue selling gas without the expense and time of having to purchase and operate a compressor. Therefore, as correctly found by the trial court, there was no legal error of fact upon which this plaintiff can rely to vitiate the waiver.
IV. DAMAGES
The first issue presented in determining the correctness of the award made to plaintiffs is the effect the "filed rate doctrine" of the Natural Gas Act has on the rights of plaintiffs to recover damages. Sections 4(c) and 4(d) of the act require a seller of natural gas to file a proposed rate increase with the FPC for its approval before such an increase can be effective. The only rate schedule ever filed by plaintiffs with the FPC in this instance was the original gas purchase contract in 1952. The FPC regulations, § 157.50(c), provide an exception to the foregoing rule in regard to a "small producer" as defined in the regulation, who has obtained a certificate from the commission exempting him from having to file a rate schedule as long as the increase in rate does not exceed the ceiling rate set by the commission. Several of the plaintiffs obtained certificates as small producers in October 1972, and the certificates issued to those parties were made effective to all plaintiffs in this action by the order of the FPC.
The trial court found that the plaintiffs were precluded by the Natural Gas Act from recovering damages, which are measured by a standard related indirectly to a retroactive price increase, except for the period subsequent to the issuance of the small producer certificates in October 1972. This holding is in accord with the jurisprudence construing the effect of this statute. Interstate Natural Gas Co., Inc. v. Mississippi River Fuel Corporation, 220 La. 43, 55 So.2d 775 (1951); Ashland Oil & Refining Co. v. Federal Power Commission, 6 Cir., 421 F.2d 17 (1970); Socony Mobil Oil Co. v. Brooklyn Union Gas Co., 5 Cir., 299 F.2d 692 (1962).
Although plaintiffs claim quantum based on an amount commensurate with the difference between the price they received and that which they would have received had they been granted a price increase in 1962, they contend their suit is for damages and not for a retroactive price increase, and is therefore not affected by the Natural Gas Act.
Plaintiffs' alternative theory of recovery is that they should recover for damages caused by the fraudulent concealment by defendant of the fact it was paying a higher price to the United States for gas which prevented them from timely filing for a change in rate schedule with the FPC.
Neither of these positions is tenable. The action for damages to be successful necessarily assumes a price increase would have been granted by the FPC. That such approval would have been granted by the commission is highly speculative and cannot serve as a basis for an award of damages. See Interstate Natural Gas Co. v. Southern Cal. Gas Co., D.C., 102 F.Supp. 685 (1952).
The trial court did not make a finding that defendant was guilty of fraudulent concealment, and we find the evidence is insufficient to support such an allegation.
The evidence shows that in the fall of 1961 several of the officials of defendant were concerned that the royalty price negotiated *264 with the United States might have the effect of activating the price adjustment clause of plaintiffs' contract. The question was submitted to defendant's attorneys who advised that payment of royalty would not have this legal effect. Defendant did not make any disclosure to plaintiffs at that time or subsequently which would have allowed plaintiffs the opportunity to seek a determination before an appropriate tribunal. In early 1974 when inquiries were made by plaintiffs, the officials of Arkla were uncooperative and evasive in answer to questions concerning the possible purchase of gas from the United States. Although this failure to inform and later evasiveness on the part of defendant was not commendable, it nevertheless does not prove fraudulent concealment. A party alleging fraud has the burden of establishing it by more than a mere preponderance of the evidence. The conclusive proof required must be by clear and convincing legal evidence. Placid Oil Co. v. Taylor, 345 So.2d 254 (La.App. 3rd Cir. 1977); Capital Bank & Trust Co. v. Core, 343 So.2d 284 (La.App. 1st Cir. 1977); and Jackson v. Fontenot Building Inc., 314 So.2d 516 (La.App. 1st Cir. 1975). For these reasons plaintiffs cannot be awarded damages bearing any relationship to an increase in gas prices for the period prior to October 1972.
Defendant primarily complains on appeal of the admissibility and probative value of the plaintiffs' evidence to sustain any award of damages. The evidence relied on by plaintiffs to prove their damages for breach of contract was the testimony of Frank J. Hall, a plaintiff having substantial gas holdings in Sligo that are subject to the contract. The evidence shows Hall to be a knowledgeable oil and gas operator with many years of experience in the exploration for, production, and sale of natural gas. Hall gathered all of the pertinent data necessary to calculate the damages to which plaintiffs claim they are entitled for the entire period from September 1961 through December 1975. Based on the data obtained, Hall, with the assistance of his accountant who is also a plaintiff in this suit, prepared schedules to reflect a comparison in the price being paid by Arkla to plaintiffs with that being paid to the United States for each year during this fourteen-year period. Under the instructions and supervision of Hall, the accountant further prepared summaries which related the differential in the price of gas to the volumes sold by plaintiffs to defendant for the period. Built into these summaries are the adjusting factors which Hall considered necessary to render the prices comparable. The summaries were further extended to calculate and show the accrual of the legal rate of interest on the sums claimed during the period.
Defendant attacks the admissibility of the above described evidence contending that the schedules and summaries were made from information that has not been offered in evidence. There is a well recognized rule that summaries of voluminous material or documents may be introduced in evidence provided the opposing party has equal access to the material from which the summaries were prepared. Wigmore, "Evidence," (1972) Vol. IV., § 1230, at page 535, Northern Pac. Ry. Co. v. Keyes, C.C.N.D., 91 F. 47 (1898); Sam Macri & Sons, Inc. v. U. S. A., 9 Cir., 313 F.2d 119 (1963); Midcontinent Broadcasting Company v. North Central Airlines, Inc., 8 Cir., 471 F.2d 357 (1973). In the instant case defendant was in the superior position and had full access to all data on which Hall relied. A substantial part of the information gathered by Hall was from records of defendant's accounting department which were inspected under discovery procedure. Hall utilized division orders prepared by defendant to determine percentages of ownership in each drilling unit over the period in question. To establish production quantities of raw gas and liquid hydrocarbons, he relied partially on records in his own office and on information obtained from the State Department of Conservation. Defendant had equal access to all such data. Although there are others who would have better qualifications because of specialized training to make such an analysis, *265 Hall has exhibited a sufficient familiarity with the underlying principles of gas pricing and methods of accounting to allow the admissibility into evidence of his testimony and the summaries prepared under his supervision for whatever weight they may have.
Defendant also attacks the weight to be given the calculations made by Hall and his accountant as it contends they are self-serving. While this evidence is to some extent self-serving, this reason alone is not sufficient to reject it in the absence of any rebuttal evidence showing that the evidence as a whole was unreliable and not prepared with any degree of objectivity.
Defendant questions the acceptance of the summaries also on the basis that Hall has calculated plaintiffs' damages by a determination of the difference between gas prices paid to the United States and the plaintiffs and by assuming the plaintiffs' contract was revised to provide for processing of raw gas at defendant's plant and payment of the entire value of extracted liquids to them and assuming that all condensate was processed by defendant free of charge and the proceeds paid to them. Defendant contends these adjustments made by Hall are improper and give plaintiffs advantages which were never intended by the "pertinent factors" adjustments provided in the Favored Nations clause of the contract. The comparability provisions of the Favored Nations clause of this agreement provides:
. . . provided that in determining whether a given price is in fact "higher" than the price provisions of this contract, the inquiry shall not be limited to the actual prices stipulated but due consideration shall also be given to a comparison of all other pertinent provisions of the two contracts, such as point of delivery, basis of measurement, taxes, dehydration, and delivery pressures (provided that the number of years stated as the terms during which the two contracts shall respectively remain in force and effect shall not be a factor to be considered for purposes of comparison under this paragraph) and the price to be thereafter payable in accordance with this paragraph for gas delivered hereunder shall be adjusted accordingly insofar as may be necessary to make allowances for any discrepancies as may exist between such comparable provisions of the two contracts.
A literal reading of this provision requires the interpretation that all pertinent factors necessary to properly equate the price of gas shall be given consideration and those specified are illustrative only. The only factor to be excluded is the length of the contract term. We find the adjustments made by Hall in the summaries were within the purview of this provision.
Plaintiffs also calculated two other items of compensatory damages claimed by all or some of the plaintiffs. The first relates to losses occurring because of income tax advantages which would have inured to all plaintiffs under depletion allowances had they received the increases in price during the years they were due rather than in a lump amount under a court award. The second refers to losses to several of the plaintiffs who contend they would have drilled an additional well in the field had they been advised timely by defendant of the facts which would have enabled them to have obtained a price increase in 1961. Both the damages for loss of the depletion allowance and the loss arising from the lack of knowledge concerning the increased gas prices are consequential damages which cannot be recoverable for the breach of an obligation to pay money. La.C.C. Art. 1935.
Defendant next complains that the method of the trial court in arriving at the award of damages was erroneous. The trial court accepted the summaries prepared by Hall as competent evidence on which to award damages, but was confronted with the problem that the summaries were prepared for the total period from September 1961 through December 1975. In order to limit plaintiffs' award for the period of October 1972 through December 1975, the court reduced the total damages reflected *266 by Hall's summary by a percentage of sixty-eight percent.
Defendant contends this method is erroneous as it gives no consideration to the differences in the actual volumes of gas produced and sold in the period for which damages are allowed and assumes that they have remained constant over the entire period since 1961. Further, defendant shows Hall's summary contains a calculation of interest for the entire period of fourteen years, and therefore, the method used by the court allows recovery of interest on sums not recoverable. Defendant also illustrates that the procedure followed by the court does not compensate each plaintiff equally for the volume of gas sold by him during the allowable period.
We recognize that during the presentation of evidence on damages, the trial court suggested to the parties on several occasions the possibility of an appointment of an expert to assist the court in this very complex matter. As this suggestion was not pursued, the court had no means at hand to accurately reduce the summaries in evidence to the period for which plaintiffs were entitled to damages, and therefore, resorted to the percentage of allocation utilized. Plaintiffs are only entitled to damages representing a difference between the price paid by the defendant to the United States and the price paid to them, after applying the adjustments for pertinent factors, for the period from October 1, 1972, through December 31, 1975. They are additionally entitled to interest at the legal rate of seven percent on the increased amount owed to them as it accrued each month during this period. La.C.C. Arts. 1938 and 2553(3).
We must agree that the method used by the trial court does not achieve this result. These calculations cannot correctly and accurately be made by this court from the record before us. Under La.C.C.P. Art. 2164 this court may render any judgment which is just, legal, and proper, including the power to remand for a new trial in the interest of justice. See Guilott v. Guilott, 326 So.2d 551 (La.App. 3rd Cir. 1976).
While we are reluctant to protract this litigation, we find it necessary to remand the case in the interest of justice to both parties for the limited purpose of a recalculation of the damages and the interest to be allowed each plaintiff in accord with the views expressed herein.
The district court may in its discretion appoint an expert in the field of oil and gas accounting to perform the necessary calculations based insofar as possible on the evidence already in the record in this matter. The court may take whatever additional evidence that is found necessary to calculate damages in accord with these views.
For the foregoing reasons, the judgment is set aside, and the case is remanded for a new trial restricted to the assessment of damages. Costs of this appeal are assessed equally to plaintiffs and defendant. Assessment of all other costs shall await final determination of this cause.
NOTES
[1] The pleadings and testimony consume twenty-six volumes containing 4,987 pages. There are additionally over 360 exhibits offered by plaintiff and over 80 offered by defendant.